Chief Justice Robertson
delivered the Opinion of the Court.
The controversy in this case arises out of the conflict-*n§ c^a*ms °f two seperate societies of professing chris-tians to the use of a house of worship, called the “Mount-meeting house,” in Woodford county, erected, in the year 1820, by the voluntary contributions of several persons then residing in that neighborhood, and dedicated by them to “ the benefit of the Baptist Society, but “ free for all gospel preachers (invited by any of the “ subscribers) on days not occupied by them.”
An acre of land on which the house stands, was given by David Harris and Tavner Branham, each of whom contributed a half an acre, and executed his sep-erate bond for a conveyance of the legal title to certain persons described as the trustees of the subscribers, to be held in trust for the purposes of the dedication just, recited. A baptist church, shortly afterwards organized' in the nieghborhood and called “ the Church of Christ,” took possession of the house, and have ever since used it as their house of public worship; and David Harris devised his half acre to that church, without any express qualification, or trust.
In the year 1834, when the number-.of the church members had increased to about one hundred and forty, dissension sprang up among them, respecting some new and peculiar doctrines of “reformation.” Dr. Fishbaci, the instituted pastor, had, with the. concurrence of a majority of the members, adopted some modification of the ancient baptist doctrines and discipline; and John Cúrd and about twenty others of the members having become “ Campbellites” or “ Reformers,” some of them were expelled, and the others seceded, organized a new *191 society, and, having appointed Elder Palmer (“ a reformer”) their pastor, claimed and attempted to enjoy cm equal use of the meeting house. That claim being resisted, the old church appointed three of its members a committee1! for the purpose of conferring with a committee of the new church “respecting the occupancy of the house,” and of referring to arbitrators the claim of the latter society, if the proposed negotiation should fail.
Conference , by committees, but no adjustment. Authority of the committee of the old church, as to a reference.
The reference . and award.
The bill, and its objects.
Whether the one or the other is, or is not, ‘a baptist church,’ is not a necessary question, and, therefore, is not decided.
The committees of the two churches, not agreeing as to the right of occupancy, submitted to the arbitrament of Col. William B. Blackburn and Gen. James McConnell the claims of their respective churches, to be decided according to evidence and law, and the arbitrators having decided that, (neither of the churches being, in their opinion, a “ baptist society,” according to the understanding of those who built and dedicated the house, at the time of the dedication,) neither of them had any legal right to the occupancy of it — nevertheless awarded that, as each of them contained members who were original subscribers and heirs of such subscribers, each should occupy the house an equal portion of time, alternately.
The old church being dissatisfied with the award, and insisting that it was not within the scope of the submission which had been authorized by that church, the defendants in error, who had been regularly constituted its trustees, according to the statute of 1814 (2 Stat. Law, 1347,) filed a bill in chancery against the plaintiffs in error, as the trustees of the new church, for setting aside the award, and enjoining the new church from disturbing the old church in the exclusive enjoyment of the meeting house and appurtenant ground, claimed by them as their right.
The Circuit Court having, by its final decree, perpetually enjoined the new church, according to the prayer of the bill, that decree is now to be revised.
The record exhibits "a large mass of polemical theology — probably abstract and unessential — which it is neither the province nor the inclination of this Court to consider, farther or otherwise than to determine, as we do determine: first — that a civil tribunal should not, upon the facts presented, decide that “the Church of Christ,'” *192 as now organized, is not essentially a baptist church or “baptist society,” according to the substantial understanding and intention of those who appropriated the property in contest; and, secondly — that, for reasons which will presently appear, it is not necessary to decide whether the “ reformers ” are, in the like sense, Baptists, or essentially belong to “ the baptist society.” And therefore, on such a subject, and in such a controversy as this especially, we shall not go out of our clearly defined judicial track to venture the expression of an unnecessary opinion.
The principal questions involved in the decision.
The dedication of a meetinghouse to the use of a religious society , creates a charitable trust— enforcible in eq. And, where the object of a bill is to secure a trust, secure peace, and enjoin multiplied invasions of an alleged right,chy. has jurisdiction of it.
At common law, a religious society, not incorporated, could not sue in its aggregate name, nor in the names of its agents or trustees not vested with a right of proper - ty. But an act of this State, of 1814, provides a mode in which trustees appointed by any organized society of Christians may hold land (notex ceeding 4 acres,) devised or conveyed to them, for the use of such society, and may maintain ac tions &c.5n their own names, for the safe-keeping and preservation thereof. And held, that, where a church, called ‘the Church of Christ,’ was in possession of an acre of ground, a moiety of which had been devised to the use of‘the Baptist Church’ in írc. and upon which the society had erected a meeting house by contributions, which they had occupied — their right unquestioned — for 12 or 15 is contemplated years ; and had after the passage of the act, elected trustees in con formitv thereto, such church must be considered as a ‘Christian society, ’ embraced bv the act — and whose trustees may maintain, in their own names, any such suit as by the act. Query — whether trustees holding only an equity, and not the legal title, can maintain any suit by virtue of the act: but held, that the legal title to a moiety gives the right-
*192 We shall, therefore, in this, as in every other case we have to decide, proceed, at once, to consider so much only of this controversy as involves the right of property or use, and depends on the laws of the land: which it is our province to administer impartially to all alike, according to our judicial opinion of their civil rights, as exhibited on the record before us.
Four principal questions are presented by the record. First — Had the Circuit Court jurisdiction? Second — Can the suit be maintained as brought, in the names of the Trustees? Third — Is the award valid and conclusive? and, fourth — Was the decree authorized by the law and the facts of the case?
First. As the dedication created a charitable trust for the use of those who are the beneficiaries, and which is undoubtedly valid and enforcible in a court of equity, and as the object of the bill in this case, is to maintain the trust, and especially to secure peace and enjoin multiplied invasions of alleged rights — we have no doubt that a suit in chancery is an appropriate and the only effectual remedy; and the fact that the contending parties are ecclesiastical bodies, does not affect the question of civil right and remedy between them.
Second. According to the common law, “the Church of Christ,” not being a civil corporation, could not sue in its aggregate name, nor in the names of its agents or trustees, in whom, as in this case, the right of property is not, either by contract or devise, exclusively vested, unless the statute of 1814 (supra) applies to the case, and authorizes a suit in the names of the defendants in *193 error, as the trustees appointed by the church since the dedication and the devise of the property.
That enactment provides, 'among other things, in substance — that, whenever any organized society of Christians shall be entitled to the use of any lot of ground, not exceeding four acres, dedicated to the purpose worship, burial, or poundage, and devised or conveyed to trustees, for the use of the church, the trustees who shall from time to time be afterwards regularly appointed by the society, may, whilst trustees, hold the title in trust for its benefit, and may, in their own names as trustees, maintain any action which may become necessary “for the safe-keeping and preservation of the said property.” of
The dedication of the property in this case should, in our opinion, be understood as having been intended for the use of “ the Baptist Society” or denomination which should be organized at Mountvernon. And this interpretation is fortified by the fact, that “the Church of Christ,” when organized in that neighborhood, took possession of the house and ground, has used and controlled them ever since, and was the devisee of the legal title to one moiety devised by Harris. If then the statute should be understood as applying to cases in which the equitable “title” only is vested in trustees, as well as to cases in which the legal title is so vested, we could not doubt that this suit may be maintained in the names of . * , the defendants m error, who were the trustees of the error, who were the trustees Church of Christ when the suit was instituted, and appear to have been appointed according to the statute of 1814. But even if the application of the statute should be restricted to cases in which the legal title, in a technical sense, shall be vested in trustees, we should be of the opinion that this suit may be maintained; because the legal title to a moiety is unqestionably in the defendants in error as trustees; and having thus acquired a right to sue, as they have sued, the entire rights of the parties are properly brought into litigation, and should be adjudged.
A portion of a religious society having seceded, andformedanew church, a contro versy arose as to their right to use the meeting house-which the old church denied. A committee ofthe old church was authorized to submit that question to arbitrators , in which the new church concurred, anda submission was made. If tho committee submitted more, as if they submitted any question as the1" old "church they exceeded anTtheTsubmfssion and award Yet6had^tbear-bitrators, under ded merely^ that bad a right to use the house, as that was a matter within the an ri^the"avrard wouid have been the°y decided that neither party mClth”?meetSng house, and yet that each should enjoy, alternately, an equal use: held, that the award is void, for repugnance and illegality upon its face, and must be disregarded in a chancery suit to settle the rights of the parties — especially, as a comp’t seeking equity should do equity, anti as, also, the old church docs not seek to enforce the award at all. A meetinghouse ted for the benefit of the BaPtist society at &e, and a church call-having occupied’itforif years or more, without objection, their right still to occupy it mu3t be admitted . And the right of a new church, composed of expelled benTof*Tim^oíd °“e> tlie use of the house, can be sustained on-the '-ict of ^lSid" But— The act of 1814, by virtue of which alone, a suit can be maintained , by or for any church or congregation of Christians, as a body — contains provisoes, declaring that, if any schism takes place in a church, for any cause other than immorality of the members, the trustees shall have no power to prevent either party from using the house of worship, a part of the time, in proportion to their numbers — not interfering with the appointments of the other. And, where the property of a society was dedicated to its use since the passage of the act, the right of the trustees to sue must be considered subject to those provisoes. The provisoes give no new right to either party of a divided church, but withhold from each the right of coercing the other by the civil power. And, where one party appeals to a civil tribunal, under the act of 1S14, relief can be given only within the measure prescribed by that act. Hence, a decree prohibiting one branch of a divided church (whose members are not convicted of immorality) from using the meeting house erected before the schism, is erroneous. The use of the house must, by the decree, be secured to both — to each a part of the time, proportioned to the relative numbers, as they may, from time to time, be found to be. And the chancellor may, from time to time, make such supplementary orders as may be necessary to give the proper effect to the decree.
*194 Third. It does not appear that the right of “the Church of Christ,” or old church, to use the meeting house and appurtenant ground, was ever denied or called in question by the new church. The claim of the latter church to a participation in the use, was the only matter of controversy, and was the only subject which the committee of the old church was authorized to submit to arbitration. If that committee intended to submit more, it transcended its authority, and the submission, so far as it was unauthorized, was void.
Nevertheless, had the arbitrators decided that the new church is entitled to an equal participation in the alternate use of the meeting house, the award, being so far within the authorized submission, wóuld have been valid and conclusive; for however unjust or palpably contrary to law such an award might have been, the parties, having constituted the arbitrators the final judges of the law of the case, to that extent and upon that matter, would have had no just ground for complaining 0f q-ie mere erroneousness of the award. .
But the arbitrators decided that neither party had a ^S^t to use ^ie church. That decision, so far as it applied to the old church, was unauthorized, and therefore v0‘d. But, so far as it applied to the new church, it was within the scope of the authority possessed by the arbitrators. But this decision was altogether irreconcilable with the subsequent conclusion and award, that each should enjoy alternately an equal use. And, as the arbitrators were required to decide according to law, when they had decided that neither party had any right,) according to the law of the case, to use the house, they , . . . . , , had no authority to award, as they did, that nevertheless eac^ °£ ^em should use it equally and alternately. Such an award should be deemed, (so far as the old church is Prej udiced by it,) void for repugnance and illegality on. its face. If it be valid to any extent, it is valid only so ^"ar as ^ decided that the new church had no right to the *195 use of the house. But, as it is so incongruous and suicidal on its face, and as, moreover, the old church, in seeking-equity, should claim it only on just and equal terms, and has not sought to enforce the award as a decision in legal effect, against the new church, but has prayed that it may be set aside and altogether disregarded, as totally invalid — therefore, we are of the opinion that, the entire award should now be disregarded, and the rights of the parties adjusted precisely as they should have been had there been no submission to arbitration.
Fourth. Understanding, as we do, that the dedication was intended for the benefit of “ the Baptist Society,” throua'h the instrumentality of a Baptist church, to be or- - 1 Hi- , . , , ’ ganized at Mountvernon, which, whenever established, should enjoy the use and control of the appropriated house and ground, we are of the opinion that “2/ie COm-members of that church, so long as they remain out of it, could not justly claim a right to any use of it or con- , . , . . , , ° , trol over it, unless invited by a subscriber. Church of Christ,” which had been so long permitted to use and control the house and ground, without plaint or question, so far as we know, from any quarter, has a right still to enjoy the use as beneficiaries on the trust estate. And without the statute of 1814, we should be of the opinion that the expelled and seceding
But the act of 1814 contains the following provisions:—
“ Provided, however, that if any schism or division shall “ take place in said congregation or church, from any “ other cause than the immorality of its members, noth- “ ing in this act shall be so construed as to authorize *196 ‘said trustees to prevent either of the parties so divided, “ from using the house or houses of worship, for the purposes of devotion, a part of the time, proportioned to “the number of each party:”
“ Provided, that nothing in this act, shall be construed “ to authorize the minority of any church having seceded “ from, or been expelled, or excommunicated from the “ church or congregation, from interfering in any man- “ ner, in their appointments for preaching or worship, “ with any appointment for similar purposes, which may “ have been made by the body or the major part of such “ church or congregation.”
These provisions are certainly anomalous, and somewhat perplexing. But they must have some effect; and, as the property in this case, was dedicated since the date of that enactment, the remedy of the defendants in error must, in some respect, be considered subject to the foi’ego-ing provisoes. As the property was dedicated to “ the Baptist society,” an expelled or a seceding minority of ‘‘the Church of Christ” as established, could not, upon common law principles, retain any usufructuary interest in the prescribed trust, if they ceased to be Baptists, because the donors restricted the trust to the use of Baptists. Was it the object of the first proviso of the act of 1814 to give and secure a right of use to such a seceding and transformed minority? We think not. There could have been no just motive for such an enactment. Nor can we believe that, if seceding or expelled members of a Christian church should renounce the Christian religion and become infidels or Mahometans, the Legislature intended to secure to them any use of the church property dedicated to the society of Christians they had deserted. In our opinion, the most consistent interpretation of the first and third provisoes of the act of 1814, is, that the Legislature did not intend to give authority to trustees of churches, to employ the instrumentality of the civil power to prevent expelled or seceding minorities of their churches, unless expelled for immorality, from enjoying a proportionate use of the church property for the purposes of Christian worship; in other words, that the Legislature did not intend to interfere between the con *197 tending parties of a dismembered church, as long as each continued to profess the Christian religion, and neither had been convicted by the other of irreligión; but intended to leave such parties to ecclesiastical discipline and authority, to the protection of their own Christian armor, and to the guidance of their own Christian charity and prudence. According to its literal import, the first proviso does not either give any new right, or recognize any existing right in an expelled or a seceding minority of a church. It only declares that the preceding authority given to trustees, should not be so construed as to “authorize” them to prevent either of the parties from using the church property for public worship in proportion to their relative numbers; that is, that the act of 1814 should not, in that respect and to that extent, apply to such a case, so as to give any remedial power to trustees.
But if seceding members of a church should sue the church, for the purpose of asserting any right which would not have existed independently of the provisoes in the act of 1814, the law would not aid them, because those provisoes do not give to them any right, but only withholds from the other party the aid of a civil remedy to coerce them.
And this interpretation is most accordant, too, with the presumed objects of the provisoes, and is rather corroborated by the third proviso, which declares that nothing in the first proviso shall be so construed as to authorize a seceding minority of a church to interfere with any appointment made by the majority; which we understand as meaning that the act of 1814 will not help such a minority against the discretion of the majority in fixing their own appointments for worship in their meeting house; but leaves them as they would have stood had that statute never been enacted.
But as “the Church of Christ,”'or old church, has appealed to a civil tribunal, under the act of 1814, the Circuit Court had no right to give relief beyond the measure prescribed by the first proviso of that statute, without which this suit could not be maintained in the names of the trustees.
Nevertheless, the decree which we are revising, en *198 joins the new church from ever using the Mountvernon meeting house, unless invited by a subscriber. Such an entire injunction was unauthorized by the act of 1814. And therefore, in this respect, the decree is erroneous.
Wherefore, the decree is reversed, the award set aside, and the cause remanded, with instructions to the Circuit Court, to decree that the plaintiffs in error and the church which they represent be enjoined from using, or attempting to use, the Mountvernon meeting house and its appurtenances, otherwise, or oftener, than shall be consistent with the exclusive right of “ the Church of Christ” or old church to use them, according to its own appointments, to be made in such a manner as to leave to the new church, in good faith, so much of reasonable time as shall correspond with the ratio of its number Lof constituent members (as composed, from time to time, of seceding members of the old church,) to that of the elder and now major church; and that the said new church be also enjoined from disturbing the said ‘‘ Church of Christ,” or old church, in the peaceful enjoyment of the exclusive use of the said meeting house and its appurtenances, according to its own appointments, to be made as aforesaid.
This decree is as definite as the provisions of the statute of 1814 and the facts before us will enable us to prescribe. If, in the application or interpretation of it, collision should hereafter occur, the chancellor below will have the authority, upon proper suggestion, at any time, to enforce the observance and prevent any improper abuse of the injunction.