CASE 56—ACTION FOR AN INJUNCTION—JAN. 23.

# Bennett, &c. v. Morgan, &c.

APPEAL FROM GRAVES CIRCUIT COURT.

JUGMENT FOR PLAINTIFFS AND DEFENDANTS APPEAL.   AFFIRMED.

RELIGIOUS SOCIETIES—DOCTRINES OF PRIMITIVE BAPTIST CHURCH—DE-
PARTURE FROM FAITH—RIGHT OF MAJORITY TO CONTROL—INTEREST
OF EXPELLED MEMBER IN CHURCH PROPERTY.

Held: 1. The doctrine of "absolute predestination" and of "limited
predestination" are both taught, in substance, in churches of good
standing in the associations of the Primitive Baptist Church,
and, as there is no unanimity upon the subject in the teachings
of those recognized as learned in the doctrine of the church, the
teaching of either of these doctrines is not a departure from the
faith as understood in 1845, at the time church property was
conveyed for the purposes of a church of that denomination.

2. Kentucky Statutes, sections 320-322, inclusive, providing for the
appointment of trustees by religious societies to hold the title
to church property, and providing that in case of a schism or di-
vision "the trustees shall permit each party to use the church
and appurtenances for divine worship a part of the time, pro-

portioned to the members of each party," do not apply where the church property is still held by the trustees or the heirs of the trustees to whom the title was first conveyed or devised as a charity; and therefore, where, in such a case, the majority had control by the terms of the organization, and there was no right of appeal from their decision, their action in expelling the minority from membership is binding on the courts, and the expelled members have no interest in the church property.

3. Independent of statute, a committee appointed by a church for that purpose may bring suit to enjoin trespasses upon the church property.

ROBERTSON & THOMAS, FOR APPELLANTS.

This is an action instituted in the Graves circuit court by the appellees who claim to be members of the Bethel Church in Graves county, and that they have been appointed a committee to sue for the use and benefit of the congregation. They allege that said congregation is the owner of a certain lot and house of worship situated thereon, and that the defendants, although former members thereof, had been excommunicated from the church, and that they were wrongfully trespassing upon said property and holding the possession thereof from the appellees and prayed for an injunction restraining the appellant from exercising any control or authority over said property. The answer of appellants put in issue every material allegation of the petition, and in addition pleaded that the title to the property was acquired by deed dated May 27, 1845, from L. B. Stark to certain trustees and members of Bethel Baptist Church, holding for the apostolic doctrine of personal election, predestination and baptism by immersion, and that these appellees had ceased to believe in the doctrines of the church or to follow its practices or usages, and that the appellants and their associates were and are the true Bethel Baptist church, and that in church session the appellees had all been turned out of the church for their heresy. With this answer, appellants being in possession of the original deed to the property filed it and prayed to be quieted in the possession and title to the property, or if it could not be done, to be permitted to enjoy its joint use, or for a sale and division of the proceeds upon equitable principles.

The reply mainly traverses the affirmative allegations of the answer, and upon the issues a great amount of testimony has been taken.

This church was harmonious for more than fifty years, and nothing occurred to disturb the peace of *Zion* until Elder R.

S. Kirkland and his brother John Kirkland began to preach at this church. From the beginning of their preaching dissensions arose, and culminated in an open breach and division of the church. The appellees and their associates who espouse the Kirkland side number sixty-two, and the appellants and their associates who protest against the innovation in doctrines number twenty-nine.

The open breach occurred at regular service, and soon thereafter each faction met and proceeded to turn the other faction out by the wholesale. Each faction claims to have turned out the other faction, not individually, but as a class. The proof shows that the church had no authority to deal with a member except in his individual capacity, and that none could be held responsible except for his own sins.

The differences which divide them is this: The Kirkland faction believes and teaches Limited Predestination, while appellants, Boaz faction, hold steadfastly to Absolute Predestination. Absolute Predestination means that "God foreknew and predestinated all things whatsoever that may come to pass whether with reference to the material universe, or to the salvation of souls."

Limited Predestination, means that God predestined all things whatsoever which comes to pass with reference to the salvation of souls only; and it repudiates the idea that God predestined the happening of things in the material world.

After the schism each faction claimed to be the true Bethel Church, and when the messengers were sent to the Association it received the messengers from appellant's faction, thereby recognizing it as the true church of God worshipping at Bethel. Afterwards the Kirkland faction joined the Philesic Association.

Our contention is:

*First.* The appellees, having departed from the faith of the church, are not entitled to any portion of the property.

*Second.* There is no contention that the appellants have departed from the faith; nor is it contended that they were expelled on account of immorality, and if the court should determine that the appellees had not abandoned the original faith in any material or substantial particular, what then are the property rights of the contending factions?

## AUTHORITIES CITED.

1. These members of the church, although a minority, holding the true faith are entitled to the property. Smith v. Pedigo, Indiana, March 15, 1893.

2. A minority unless excluded for immorality are entitled to a portion of the use of the property. Kentucky Statutes, sec.

322; Ranson v. Rogers, MSS. opinion, Oct. 1884, Boone circuit court, Shannon v. Frost, 3 B. Mon., · 256; Hadden v. Chom. 8 B. Mon., 76; Gibson v. Armstrong, 7 B. Mon., 486; Kentucky Statutes, sec. 318, 320, 321, 322; 7 Dana, 193; 7 B. Mon., 484; 5 Bush, 403; Craegdalie v. Aikman, 2 Bligh, 529; Craegdalie v. Aikman, 1 Dow., 1 Atty. Genl. v. Pearson, 3 Mon., 353; Watson v. Jones, 13 Wall, 680; Schorr's Appeal, 67 Pa. St., 138.

D. G. PARK AND H. J. MOORMAN, FOR APPELLEES.

The questions involved in this appeal are:

1. Have appellees the right as such committee to sue for the church and maintain the action, or if there is a defect of parties had it been waived by appellant's course of action?

2. Is the judgment of the lower court sustained by the evidence?

3. Has any schism been alleged or proven?

4. Are the rights of the parties to be determined under the rules of the common law giving the successful parties the exclusive use of the church property, or under our statute dividing the property over a schism as in cases where the churches have elected or appointed trustees under the statutes?

5. Do appellants constitute the church at Bethel because of any departure from the faith by appellees?

(1.) The appointment of the committee was by the unanimous action of the church. Under this appointment we contend this action can be maintained by the committee.   Civil Code, sec. 25, and note thereto; Humphrey v. Burnside, 4 Bush, 222; Shannon v. Frost, 3 B. Mon., 261; Hadden v. Chorn, 8 B. Mon., 72; Cahell v. Bigger, 8 B. Mon., 213; Berryman v. Reese, 11 B. Mon., 288; Beatty v. Kurtz, 2 Peters, 566; Rose's Notes (vol. 2) 878.

(2.) We submit that each fact adjudged by the lower court is abundantly sustained by the proof in this record.

A minority or seceding party can not destroy the identity of a religious society or church by claiming to· be, itself, the society or church.  8 B. Mon., 77; 3 B. Mon., 261; 11 B. Mon., 289.  The only · exception to the rule is where the majority have departed from the original faith of the church and the minority hold to its true doctrine.

But there was no departure from the faith by appellees, and this is clearly shown by the record.

## ADDITIONAL AUTHORITIES.

Manuscript opinion, 1884, Ransom v. Rogers, 2 Statute Laws of Ky., Act of 1814, page 1347; Revised Statutes, chap. 14, sec. 3, sub-sec. 1; Gen. Statutes, chap. 13, sec. 3, sub-sec. 1, Kentucky

Bennett, &c., v. Morgan, &c.

Statutes, sec. 32; Inglehart v. Rowe, 20 R., 823; 3 Ency., Brittanica, 356; Encyclopedia Religious Knowledge; Russell's Church History, 649, 650; London Confession of Faith, chap. 3, sec 1; chap. 4 sec. 2; chap. 5, sec. 2; chap. 6, sec. 1; chap. 9. secs. 1 to 5; chap. 11, sec. 5; chap. 15, secs. 2 to 5; chap. 16, secs. 2 to 6.

OPINION OF THE COURT BY JUDGE DURELLE—AFFIRMING.

In 1824 a Primitive Baptist Church called "Bethel Church" was organized in Graves county, and there seems to have been no trouble in the church until the events which led to the present litigation. In February, 1845, the church resolved to move, and build a meeting house upon land to be donated by L. B. Stark. The deed for the land recites that Stark, for the great love he has for the Baptist cause, conveys the land in question by warranty deed to three persons named as commissioners of the Bethel church, and their successors, holding forth the apostolic doctrine, to wit, personal election, predestination, baptism by immersion, etc., to have and to hold so long as they shall see cause to occupy the aforesaid lot as a church; and, if they remove, the land therein conveyed to revert to his heirs. Upon the organization an abstract of principles, rules of decorum, and a church covenant were adopted, and seem to have remained unchanged. The Bethel Church was originally a member of the Bethel Association. In October, 1891, six churches belonging to that association were granted letters of dismission, as they wished to organize a new association. A new organization was organized, called the "Philesic Association." Bethel Church remained in the Bethel Association. The churches forming the Philesic Association had substantially the same abstract of principles and rules of decorum as those in use in Bethel Church. In October, 1894, at a meeting

of the Bethel Association at the Church of Concord, peti-
tionary letters of correspondence being called for, one was
presented from the Philesic Association, and a motion
that the Philesic Association be received into correspond-
ence was lost.   It is not material to consider whether there
had been any dissension in the church before Elder R. S.
Kirkland became pastor of the Bethel Church.   Some four
or five years before the events under consideration, Elder
R. S. Kirkland and his brother, John V. Kirkland, began
preaching in the church.  Elder Kirkland was a member
of a church which belonged to the Philesic Association
at the time he became pastor of Bethel Church.   There
had been some trouble between Elder Kirkland and Elder
Boaz upon doctrinal points.   At a church meeting on the
Saturday before the fourth Sunday in October, 1894, it
was agreed unanimously that the church was at peace, and
would commune the next day, which was the regular com-
munion Sunday; but, when preparation was made for com-
munion after service on Sunday, Mr. Cavender, a member
of the church, stated that the church was not in condi-
tion to commune.   A committee was appointed to investi-
gate the reason why communion services should not be
held.   At a meeting held on the Saturday before the fourth
Sunday in November, the committee reported "that the
reason that the church could not commune was that some
of the members thought that it was not order for the
church to commune with members of the Philesic Associa-
tion, Bethel Church being a member of the Bethel Asso-
ciation, and these two associations not being in corres-
pondence, and the pastor, R. S. Kirkland, being a member
of a church in the Philesic Association."   A motion to re-
fer the point of order to the church was carried by a
large majority.   All of the members present appear to

have participated. It was voted by a large majority of the church that, notwithstanding this objection, it was in order for the church to commune. Some eighteen of the members who had voted in the negative refused to abide by the action of the church or commune. After laboring with the minority, the majority—some forty-five in number—adopted a motion preferring charges against the eighteen for treating the church with contempt and for breaking the church covenant. Section 8 of the rules of decorum provides: "A majority shall govern in all cases, except in reception and dismission of members. In this case a unanimity is necessary, which shall be sought for by forbearance and labor in love and tenderness, which ought to terminate in submission to the majority in the fear of God." The church covenant contains a stipulation: "To be governed by proper discipline agreeable to God's word, . . . and not absent ourselves from the Lord's supper without a lawful excuse, . . . and not irregularly to depart from the fellowship of the church." The eighteen members who had refused to abide the decision of the majority were thereupon, by a unanimous vote of those voting, excluded from the church. Some or all of them appear to have declared nonfellowship with the doctrine which they claimed had been preached in that church by Elder Kirkland. Whether this was before or after the vote of exclusion is a matter of conflict, and is not particularly material. They appear to have organized as a church, obtained a church book, and adopted a vote excluding from the church the majority who had theretofore excluded them. The minority appear to have had possession of the key to the church. The majority changed the lock. It was claimed that the minority used an axe in obtaining entrance. The majority appointed a committee to insti-

tute proceedings to put a stop to what they considered trespasses upon the church property. That committee instituted this suit to enjoin the appellants from further interference, claiming that appellees—the majority—were the Bethel Church. The minority answered, denying the material averments of the petition; claiming that the majority had ceased to believe in the doctrines held by the church at the date the property was acquired, or to follow its practices or usages; that the minority and their associates were the true Bethel Primitive Baptist Church, and that in church session they had excluded the majority for their heresy. They prayed to the quieted in their title and possession; or, if that could not be done, for a sale and division of the property. It will be observed that neither party to the controversy set up any claim that there was a schism in the church. The original trustees were all dead, and no trustees had ever been appointed under the statutes.

An immense mass of testimony was taken upon the various doctrinal points, in which it was claimed there had been a departure upon the part of the majority from the true principles of the Primitive Baptist Church; especially the doctrine upon the subject of predestination. The majority, or Kirkland faction, believe and teach limited predestination; while the minority, or Boaz faction, hold steadfastly to absolute predestination. As stated in the brief of counsel for the minority, the distinction is this: "Absolute predestination means that 'God foreknew and predestined all things whatsover that may come to pass, whether with reference to the material universe or the salvation of souls,'—that is, God predestinated all things which happen. He foreknew and predestinated that President McKinley should be assassinated in

Buffalo, and that your honors should sit in judgment in
this settlement of the rights of these litigants; as well as
he predestinated who should or should not be saved in
heaven. Limited predestination means that God predestinat-
ed all things whatsoever which may come to pass with
reference to the salvation of souls only, and it repudiates
the idea that God predestinated the happening of things
in this material world." The weight of the testimony
upon this question seems to be that both these doctrines
were taught, in substance, in churches of good standing in
the associations of the Primitive Baptist Church, and that
there was no such unanimity upon the subject in the vari-
ous authorities cited, or in the teachings of those recog-
nized as learned in the doctrine of the church, as would
justify us in holding that there had been, by either the
majority or the minority, a departure from the faith as
understood at the time the church property was conveyed
for the purposes of Bethel Church, holding forth the
apostolic doctrine, to wit, personal election, predestina-
tion, baptism by immersion, etc. So the trial court ad-
judged, and awarded an injunction against the minority
interfering in any manner with the majority in the ex-
clusive use of the property as a church.

After the acts of exclusion upon each side, it is claimed
that the Bethel Association declined to hold correspond-
ence with Bethel Church as managed by the majority,
but recognized the church organized by the minority as
the Bethel Church. On the other hand, it appears from
the overwhelming testimony upon both sides that each
Primitive Baptist Church is complete in itself; has power
to choose its own ministers, and adopt its own rules and
regulations; that it is in fact a little republic, and from
the judgment of the majority, there is no appeal. This

statement is, of course, subject to the limitation, as to
property rights, that, if there has been radical departure
from the doctrine for which the charitable use was estab-
lished, the courts will intervene for the protection of the
use in accordance with the terms of the grant. This lim-
itation, as we have seen, does not apply in this case. It
follows, therefore, that as appellees were undoubtedly the
majority, undoubtedly excluded appellants, the minority,
from membership in the church, and as, by the terms of
the organization, the majority had control, and their de-
cision is unappealable, the courts can not intervene; unless
the case comes within the act of 1814 (2 Morehead & B.,
Kentucky Statutes, 1347), as carried through the various
revisions of the statutes, and substantially re-enacted in
Kentucky Statutes, section 320 *et seq.* The purpose and
effect of that statute is perhaps nowhere better stated
than in the opinion by Chief Justice Robertson in Shannon
v. Frost, 3 B. Mon., 256: "After a careful examination
of this statute, we concur with the court below in the opin-
ion that it has no application to or bearing on the case now
before us. The chief object of the enactment seems to have
been to prescribe a mode of transmitting to new trustees
the legal title to church property after the death or re-
moval of the trustees to whom it had been originally con-
veyed, and to vest such appointees with all the powers of
their predecessors, qualified, as to the former, by the pro-
visos. The act does not, in either letter or purpose, apply
to a church or the trustees of a church, when the church
property is still held by the trustees or the heirs of the
trustees to whom the title was first conveyed or devised as
a charity." To the same effect, see the opinion of Judge
Breck in Hadden v. Chorn, 8 B. Mon., 78, and that of Judge
Simpson in Berryman v. Reese, 11 B. Mon., 287. This doc-

trine was expressly recognized by Judge Pryor in his opinion in Ransom v. Rogers (Oct. 2, 1884), the syllabus of which is given in 6 Ky. Law Rep., 290, though in that case it was held that the church, by its voluntary action, had undertaken to act under chapter 13 of the General Statutes, and had thereby become subject to the conditions expressed in the act. As the statute does not apply, the conclusion stated by Judge Robertson in the case of Shannon v. Frost, supra,—a case strikingly similar in many respects to the case at bar,—is completely applicable: This court, having no ecclesiastical jurisdiction, can not revise or question ordinary acts of church discipline or excision.

Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it, and these we must decide as we do all other civil controversies brought to this tribunal for ultimate decision. We can not decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly, cut off from the body of the church. We must take the fact of expulsion as conclusive proof that the persons expelled are not now members of the repudiating church; for, whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this court. For every judicial purpose in this case, therefore, we must consider the persons who were expelled by a vote of the church as no longer members of that church, or entitled to any rights or privileges incidental to or resulting from membership therein. As the conveyance from Crittenden was to the use of the Baptist Church as an organized body of professing Christians in Frankfort, every member of that church has a beneficial interest in the property thus conveyed so long as he or she shall continue to be a member, but no

longer. It is only as a constituent element of the aggregated body or church than any person can acquire or hold, as a *cestui que* trust, any interest in the property thus dedicated to that church. Curd v. Wallace, 7 Dana, 195, 32 Am. Dec., 85. Such is the effect of this conveyance to congregational uses, and such the civil law of our State; and upon this foundation alone must our decisions rest. The judicial eye of the civil authority of this land of religious liberty can not penetrate the veil of the church, nor can the arm of this court either rend or touch that veil for the forbidden purpose of vindicating the alleged wrongs of the excluded members. When they became members, they did so on the condition of continuing or not, as themselves and their church might determine. In that respect they voluntarily subjected themselves to the ecclesiastical power, and can not invoke the supervision or control of that jurisdiction by this or any other civil tribunal." See, also, Gibson v. Armstrong, 7 B. Mon., 481; Haddon v. Chorn, 8 B. Mon., 75; Cahill v. Bigger, Id., 213; Berryman v. Reese, 11 B. Mon., 287; and Iglehart v. Rowe (20 R., 821) 47 S. W., 575. See, also, the elaborate opinion of Judge Lurton, March 5, 1892, in the Primitive Baptist Church case of Nance v. Busby (Tenn. Sup.), 18 S. W., 874. That the action can be maintained by the committee is, we think, clear, notwithstanding the apparent appeal of the act of 1835 (Loughborough, Kentucky Statutes, p. 499) authorizing the appointment of a committee for such purpose; for this right is recognized to exist, independent of the statute of 1835, in Berryman v. Reese, 11 B. Mon., 288, and in Haddon v. Chorn, supra, citing Beatty v. Kurtz, 2 Pet., 566, 7 L. Ed., 521.

For the reasons given, the judgment is affirmed.