## Parker et al. v. Harper et al.

Nov. 12, 1943.

J. L. Harrington and A. F. Childers for appellants.

W. Claude Caudill and W. W. Burchett for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

We have a controversy between two groups over
the control and use of church property. The adjudica-
tion of such cases is often a matter of delicacy, for it
deals with dictates of conscience and force of conviction.
It pertains to that which has led men throughout the
ages into bitter strife, in former years to the dungeon
and stake. In later years partisan strife within the
churches themselves, often over matters which are in-
consequential from the ordinary, temporal viewpoint,
has given solicitude to all who have the advancement of
religion at heart. The separation of church and state is
the recognition of the separation of things spiritual or
ecclesiastical and things temporal or secular. The jeal-
ous regard for this fundamental principle of our gov-
ernment leaves controversies of a doctrinal or theologi-
cal nature and disciplinary measures affecting individ-
ual membership in any congregation of worshipers
strictly in the ecclesiastical judicature. It is only when
a controversy involves a civil or property right that the
hand of the secular court will take hold and exercise its
power. But in adjudicating such cases, the courts of ne-
cessity are sometimes called upon to decide which of
two contending groups represents the true faith and
doctrine of the denomination or sect to which the prop-
erty belongs. The case at bar belongs in this class al-
though it is not a clash between two denominations but
between factions within one church with the line of cleav-

age unclear. The controversy is within a church variously or interchangeably called the Church of Christ, Christian Church or Disciples of Christ. It is strictly congregational in its government and activities. Martin v. Kentucky Christian Conference, 255 Ky. 322, 73 S. W. (2d) 849; Kentucky Christian Missionary Society v. Moren, 267 Ky. 358, 102 S. W. (2d) 335.

In dealing with controversies within churches having the congregational form of government without any judicatory with revisory powers, it is well recognized that the determination of any question by a majority of the members is final. As was written concerning a Baptist Church by the late Judge Logan, an eminent layman of that denomination, in Thomas v. Lewis, 224 Ky. 307, 6 S. W. (2d) 255, 258, such a congregation is "a pure democracy," and "as long as it acts as a local church functioning under its own laws and regulations [it] may say to all mankind that, 'Mine are the gates to open and mine are the gates to close.' No power may interfere with the authority of the local congregation so exercised." And as further said: "The minority is always bound by the majority." But the opinion recognizes the qualification that if the property is impressed with a trust with particular terms, the trustees will not be allowed to violate them. This condition is more definitely stated in Martin v. Kentucky Christian Conference, supra. That opinion, written by the late Judge Clay, an eminent layman of the Christian Church, has placed in our records an interesting and instructive history of the origin and primary doctrines of that church. The question with which it dealt was whether a group which withdrew from affiliation with an organization known as the Kentucky Christian Conference and decided to have communion service every Sunday instead of less often or the group which had voted to the contrary, was entitled to the use of the property. The lot had been donated to the congregation for "the purpose of building a church for worship for the Christian Church," and the deed contained a reversionary provision should it be used otherwise. It was found by the court that affiliation with the Conference was a matter for each congregation to determine, and that either practice with respect to the communion services is proper within the polity of the Christian Church; hence, that the majority vote of the congregation should control. The opinion recognizes that where property has

been dedicated to advance or disseminate a particular religious doctrine or faith, and conflicting claims arise over its ownership or possession, the civil courts will determine which of the rival claimants are holding to the faith that the donor desired to favor and will award the property to them. The rule is also referred to in Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684, 690, where dissenters from the unification of the Cumberland Presbyterian Church and the Presbyterian Church in U. S. A., claimed the ownership of local church property. It is there stated that the rule prevails regardless of the form of government and, in addition: "If there be no specific religious trust impressed upon the property, and it belongs to a church of the congregational form of government, and there arise a schism in the congregation and a dispute as to the property, the civil courts, if appealed to, will generally award it to that faction which constitutes a majority of the *original* congregation, because congregational churches are usually governed by a majority of the members." (Emphasis added.)

By the great weight of authority, the courts will exercise their powers to protect a minority in a congregational or self-governing body of church members, however regular the action or procedure may be, against a diversion of the property of the church to another denomination or to a group supporting doctrines radically and fundamentally opposed to the characteristic doctrines of the society or body or disavowing such tenets and practices even though the property is not subject to an express trust. 45 Am. Jur., Religious Societies, Sec. 55; Mitchell v. Church of Christ, 221 Ala. 315, 128 So. 781, 70 A. L. R. 71; Annotations, 70 A. L. R. 83. This court has held that the title to the property of a divided congregation is in that part of it which is acting in harmony with its own fundamental laws. First Presbyterian Church of Louisville v. Wilson, 14 Bush 252, 77 Ky. 252. Compare, also, Kinkead v. McKee, 9 Bush 535, 72 Ky. 535; Lewis v. Watson, 4 Bush 228, 67 Ky. 228.

We have thus reviewed the law first in order to have the several rules before us in deciding the question whether under the evidence the conflict between the rival claimants is to be regarded (a) as of the class where a majority may control the disposition of the property or (b) as a diversion of the property from the fundamental doctrines of the original organization and

the faith of those who were responsible for its acquisition.

Under the auspices of a voluntary organization, known as the Appalachian Mountain Evangelistic Association, which is engaged in missionary work, in establishing and reviving churches of the Christian or Church of Christ denomination, in providing means for boys to be educated as ministers, and in distributing charity, two young men, Bennie Hunt and Julian Hunt, following others who had gone before, went to Martin, a village in Floyd County, in 1935. They held extended revival services in a tent and with the assistance of Rev. Alvis Ford organized a congregation with about fifty members. A lot was bought and partly paid for. The title was lodged in three trustees "for the Church of Christ." It appears there has never been a regular pastor of the congregation. They continued to meet and worship in the school gymnasium, with visiting ministers from time to time preaching and holding meetings for them. The services were not held with complete regularity, and while the organization often slumbered it turned over now and then and from time to time revealed that it was not dead but only asleep. In 1938 the congregation had become quite dormant and one of the Hunt boys and another young preacher returned and conducted a revival in a tent for several weeks. They, with some members of the flock, dug a basement and raised some funds for a building. Sometime in 1939, when the building had been erected, but was without lights and seats, A. E. Harper, an evangelist of the Church of Christ, upon invitation of some of the brethren, held a revival meeting extending over quite a period of time. It appears that at first nothing was said touching the matter of doctrine, particularly in regard to the use of instrumental music in the services. It seems there had never been any musical instrument used, apaprently because the congregation had no money with which to buy one. As time went along, Harper began to preach upon and emphasize doctrines different from those proclaimed by his predecessors and accepted by the church. When he had insinuated himself into the confidence of the congregation, he fully indoctrinated some of them with his beliefs and proceeded with proselyting others. He displayed hostility to and made disparaging remarks concerning those who did not agree with him. When he was shown the book containing the

names of the church members by the secretary of the congregation, he tore out and took away those leaves, saying he would have use for them. Finally one day he passed out slips of paper and asked those present to sign them and made a new roll. A number of the original members signed these slips or roll in total ignorance that they were joining a new organization or abandoning the faith of the original group. At a meeting, which may or may not have been regular, new trustees of the property were chosen. A few months later one of the Hunt boys returned and found considerable dissension. He apparently added fuel to the flame. He and those adhering to him were denied the use of the church. This suit was brought by one of the original trustees to recover the property. One of the three had moved away and severed his connection with the church and the other had allied himself with the Harper group. The present condition of the membership seems to be that some of the original members and most of the new members are favorable to Harper's teaching, while the opposing group seems to consist largely of the original membership.

There is evidence that the rival claimants represent two separate and distinct denominations, those favoring the use of instrumental music being known as "The Christian Church" and those opposed as "The Church of Christ." However, it appears that every church of the denomination in the Big Sandy Valley (except in Pikeville), regardless of the practice respecting instrumental music, is called "The Church of Christ." It is testified by one witness that there are forty-two points of doctrinal disagreement, although not that many are specified. What we may refer to as the Harper faction is opposed to the use of instrumental music in the church, to the support of missionary organizations and of church related schools, to activity of women in church, and to the use of instructional and interpretative literature in the Sunday School. These differences, it is testified, are deemed very essential by those who are called the "antis." Mr. Harper deemed them so acute that he proclaimed "he would as soon belong to the Pope or the Mormons as to belong to the other group."

As gathered from the original declarations of faith of the Christian Church or Church of Christ, as published in Martin v. Kentucky Christian Conference,

supra, and from general knowledge, we understand there has never been any fundamental or established creed or dogma of the church as a body of religious worshipers other than the broad acceptance of the New Testament without specific interpretation. Indeed, there is no unified body but only a society of Christians, composed of independent, co-operating congregations. It is left to each congregation to interpret the scriptures as they pertain to the forms and practices of worship. Particularly applicable, it would seem, is the manifestly just rule that as against a protesting faithful minority, the courts will not permit the diversion of the property by those who support doctrines radically and fundamentally opposed to the characteristic beliefs of the founders of the local church. In respect of the practices or tenets forming the schism in the church at Martin, we would not be understood as saying that either is to be regarded as representing the true and faithful teaching of the body of Christians known by the several names stated or as the historical position of the denomination generally. It is not for us to draw the line between orthodoxy and heterodoxy, especially where substantial unanimity of authority upon the subject is lacking. Compare Bennett v. Morgan, 112 Ky. 512, 66 S. W. 287. But we may express the opinion that in any case the departure must be substantial in character and from the fundamental or distinctive teachings and practices of the denomination, or based upon a difference in material and vital creeds. It seems to us that the same rule relating to dissensions over doctrinal matters applicable to constituent bodies of a unified denomination with an established creed is applicable also to individual, sovereign and wholly independent congregations of the Christian Church or Disciples of Christ. It has been substantially so held by this court in determining analogous situations in churches with less individuality.

Thus it was held in Harper v. Straws, 14 B. Mon. 48, 53 Ky. 48, that a church organization cannot be divested of its property by a part or even a majority of its members reorganizing under the same or another name provided the old organization still exists. Of like effect are Wallace v. Hughes, supra, from which we have made a quotation, and the First Presbyterian Church of Louisville v. Wilson, supra, as we have stated. In Bennett v. Morgan, supra, dealing with a schism in a Primitive Baptist Church over the extent of the doctrine of

predestination, both degrees of belief being recognized in the practices of such churches, it was held that the control by the majority is subject to the qualification that where there was a radical departure from the doctrine for which the charitable use was established, the courts will intervene to protect the use in accordance with the terms of the grant. But the qualification was held inapplicable to the facts. The distinction between that case and this is that a majority had expelled a minority from the membership, which was an act within their powers. There was no excommunication in the case at bar. The group within the congregation proceeded to organize a new body and take over the property as their own.

It is declared in Chrapko v. Kobasa, 271 Pa. 447, 114 A. 254, that a faction cannot introduce vital changes in forms and fundamental doctrines and at the same time assert the right of possession and control of church property. If a majority of a Baptist congregation should determine to abandon immersion as the exclusive form of baptism, they could not claim the property to the exclusion of the minority adhering to that fundamental belief and practice which through many generations of observance have become intimately and inseparably wrought into the organized life of every Baptist Church. Dix v. Pruitt, 194 N. C. 64, 138 S. E. 412. A majority cannot divert the property to use inconsistent with the purposes of the organization by employing a pastor whose teachings are inconsistent with those of the sect to which the church belongs. Franke v. Mann, 106 Wis. 118, 81 N. W. 1014, 48 L. R. A. 856.

The evidence in the case at bar is that both local groups do regard the grounds upon which they have divided as very vital and substantial. Other than their declarations, the sorry fact is that they have proven to be important and potent enough to break up the struggling little church which had scarcely been established at the cost of much service and sacrifice. We are of the opinion there was such departure from the faith of the founders of the church at Martin as calls for the protection of their property rights by the courts.

We think the trial court erred in declaring the two defendants chosen by the new organization as trustees of the property, namely, Ance Muncy and Charles Caudill, to be "the duly elected, constituted and acting trus-

694

tees" of the church, and that judgment should have gone for the plaintiff.

Wherefore the judgment is reversed.

Whole Court sitting.