## Pelley et al. v. Hill et al.

Nov. 21, 1944.

Orie S. Ware for appellants.

Sawyer A. Smith and H. W. Vincent for appellees.

Opinion of the Court by Morris, Commissioner—Affirming.

Appellants, more than twenty in number, and plaintiffs below, claimed in their petition filed in May, 1944, that they were at the time of its filing and are now, the duly elected and acting elders, deacons and officers of Latonia Christian Church of Covington. The appellees, defendants below, ten or more in number, defending for themselves, and all others similarly interested, assert that they are the persons duly elected and installed as such functionaries. The plaintiffs sought by their suit to have the court declare the defendants interlopers, and for orders enjoining them from undertaking to have management of the secular affairs of the Church. The proof was taken in open court before the two judges above named, and upon submission they denied the relief and dismissed the petition, and from a judgment so ordering this appeal is prosecuted.

The judges filed their findings of facts and conclusions of law, and incorporated an extended opinion which so clearly states the facts and conclusions that we have concluded to adopt it with some minor interpolations, as our opinion.

"Plaintiffs, to whom we shall refer as the Old Board, and defendants the New Board, claim to be the regularly constituted members of the Official Board of the Latonia Christian Church, and each disputes the right of the other to exercise the duties of the offices of the church. The controversy was precipitated April 2, 1944, when the pastor Rev. Hill submitted his written resignation from the pulpit at the conclusion of the devotional services. It would serve no useful purpose for us to enter into a detailed recitation of the events that led up to the minister's resignation.

"A motion not to accept the pastor's resignation was passed by an overwhelming vote. Thereupon Mr. Orvill Noel, a member of the Church and a member of the Old Board, after resigning, moved that all offices of the church be declared vacant. By a standing vote this motion was passed 294 to 29. A motion that the pastor appoint a committee of four, two members from the Old Board and two from the congregation, the fifth member to be the pastor, to formulate recommendations and suggestions for the conduct of the Church was duly passed. On Easter Sunday, April 9, 1944, upon the completion

of the religious services, the committee filed its report and recommendations which were read to the congregation, and presented (to each member) a ballot of candidates for elders, deacons and trustees. After the ballots were distributed the members present voted 284 to 32 to elect the New Board, consisting of three elders, three trustees and twenty-one deacons.

"Plaintiffs and defendants thereafter sent separate written notices for a special meeting to be held on Tuesday May 2, 1944. Plaintiffs notices were sent out under signatures of the members of the Old Board and 68 members of the Church, designating the main auditorium of the Church as the meeting place. Defendants' notices were sent out under the signature of the pastor, the Chairman of the (New) Advisory Council and secretary pro tem, designating the auditorium in the basement as the meeting place. Plaintiffs' notice evidenced that the meeting was called for the purpose to rescind and set aside the action taken by the congregation on April 2, 1944, and April 9, 1944." We gather from proof that defendants' notices were for the purpose of appointing some minor officers.

"Pursuant to these notices for the meeting of Tuesday, May 9, 1944, members of the Church gathered in the main auditorium. At the appointed hour the Chairman of the Old Board and Chairman of the New Board arose to call the meeting to order. Because of a general disorder and confusion, and at the suggestion of the leaders of the Old Board, the Old Board and the members of the Church, who were favorable to it, retired to the basement of the Church, leaving the members of the New Board and its adherents upstairs to conduct their meeting. At the meeting in the Sunday School auditorium a deacon of the church introduced a resolution to rescind all purported action of the congregation on April 2, 1944, and of April 9, 1944, and to declare the elders, deacons, trustees and members of the Old Board to be the Official Board and officers of the Church. This resolution passed unanimously. A motion that the pulpit be declared vacant carried unanimously by those present at the meeting held downstairs." This matter was not hinted at in the notice.

"The Latonia Christian Church has the congregational form of government, without any judicatory with revisory powers, and the determination of all questions

is by the authority of the Church vested in the majority of the members of the Church. On April 2, 1944, the Church had an active list of members of approximately 980. Since April 2, 1944 to May 11, 1944, about 120 new members have been admitted to the Church, some of whom were former members of the Church. The Church owns property of the reasonable value of $100,000.00 and the finances of the Church are sound.

"It is plaintiffs' contention that they are the duly elected, qualified and acting officers of said Church, and as such have the right to conduct all the affairs of the Church and to hold and manage the personal and real property of the Church. It is defendants' claim that by the conduct of the congregation, present on April 2, 1944, the offices which plaintiffs had occupied were declared vacant; that by the conduct of the congregation of April 9, 1944, they were duly elected and are now the qualified and acting officers of the Church with the right to manage and control the property, monies and securities of the Church. This controversy arises because the Old Board refuses to turn over to the New Board the books, accounts and properties of the Church.

"At the outset counsel for defendants vigorously argues that no property rights are involved, hence the court cannot entertain jurisdiction to determine the validity or invalidity of the matters of April 2 or April 9. The argument is weighed with sufficient appeal to incline us favorably to their position, if it were not for the fact that this church owns real and personal property, with the right to control, hold and manage this property of the church vested in those officers who have been duly elected. We are constrained to conclude that we have the duty to determine who are the duly elected officers of the church.

"Fortunately, the differences are not of faith or doctrine, but rather of church government. The church does not possess a constitution or by-laws, and its form of government is solely congregational. Neither faction has withdrawn from the church. Neither plaintiffs nor defendants have been denied the right to use of the church property, as a consequence of which our duty is limited to a determination as to who are the duly elected qualified officers."

The court then cites opinions of this court which justifies its conclusion that under the existing circum-

stances it was empowered to determine the controversy, the most recent being Parker v. Harper, 295 Ky. 686, 175 S. W. 2d 361, which cites a number of similar cases. The court also cites sustaining text law.

"It is persuasively argued by plaintiffs' counsel that the meeting of the members of the congregation, April 2, was irregular and illegal for the following reasons:

"(1) No notice was given to the officers or members of said church of the meeting.

"(2) Because it has been the habit, custom and usage of the church, over a long period of years, that the Old Official Board of the church must first consider any and all matters before being submitted to the congregation."

"The storm center of the litigation is the conduct of the members of the church of April 2, 1944, in declaring all offices vacant. Counsel for plaintiffs correctly argues that if the conduct of the members of the congregation of April 2, 1944, was irregular and illegal plaintiffs are the duly elected and qualified members of the Official Board.

"Applying declared principles of law to the instant case it is our duty to ascertain what the majority of the members of the Latonia Christian Church have voiced at a regular meeting held at a time and place in keeping with the customs and usages of this church. Returning to the vigorous and sincere objection of counsel for plaintiffs as to the illegality of the meeting of April 2, 1944, we conclude from the record that the Latonia Christian Church had three regular meetings each week, Sunday morning, Sunday and Wednesday nights. The record before us is clear that all business was transacted on a Sunday morning following the devotional services; pastors of the church were approved, officers elected, and the ceremony of the burning of the mortgage, all were conducted on Sunday morning following the devotional services. The record discloses not a single item of business transacted by the church on any other day than Sunday. With added vigor and sincerity counsel for plaintiffs contends that the meeting and the conduct of the congregation of April 2, 1944, in refusing to accept the pastor's resignation and in voting to vacate all offices, was not and could not be a regular meeting because no notice was given to the members of the Board

or to the members of this church of this meeting. Plaintiffs have not, however, sustained the burden to show that it was the custom or habit for notice to be given. We conclude that no notice was required.

"Counsel for plaintiffs more seriously and more persuasively argue that this meeting of April 2, was irregular and illegal because it has been the custom, practice and habit over a long period of years for the Official Board first to consider all matters before presentation to the congregation. In plaintiffs' testimony there is a cardinal assumption, which they take as well nigh undisputable and self-evidenced that the Official Board is all powerful and sovereign as against a majority of the membership. Even if we are to assume that it was the custom of the Official Board over a long period of years not to submit to the membership of this church any matter for its consideration before it (the Board) first considered it, there is no proof that the membership of this church vested the Official Board with this authority. This Board possesses no power or right that the membership does not confer upon it. Moreover, we know of no law that would give the Official Board such power as opposed to the rights of the members of this congregation. A majority of the members of this church control all matters. If a majority of the members at a regular meeting desire to vote upon a question, they possess that right at all times, notwithstanding the position taken by the Old Board.

"Plaintiffs' proof is that the Board did consider matters before presenting them to the congregation, but for us to hold that the membership cannot consider any matter first, would be for us to destroy the principle that in a Christian Church the voice of the majority is not supreme and its decision on all questions final. Counsel for plaintiffs emphasizes the fact that this is the first time that membership took such revolutionary means. This adds little strength to plaintiffs' position." The court found from proof that the custom was not followed, at least on one occasion.

"In 54 C. J. (under the heading 'Religious Societies'), p. 25, sec. 48, we read: 'Where his term of office is not limited in time, an officer of a religious society continues in office until he is duly removed, or another is appointed to succeed him, and unless they resign officers or committees elected or appointed for a stated

term continue in office, not only until the expiration of their terms, but until their successors are selected and qualified. In societies having a congregational form of government, trustees, even where their tenure has been fixed, hold offices subject to the discretionary power of the majority to terminate their holding at any time and to appoint successors, and the subsequent ouster or removal of their successors does not entitle the old officers to hold over.'

"Section 50: 'An officer cannot be removed on grounds other than those provided by the rules and discipline of the church. In a congregation subject to the superior jurisdiction of the church to which it belongs, officers cannot be removed by a majority of the congregation in violation of church rules. In Churches of the congregational type, the congregation's power by a majority vote to remove is discretionary and may be exercised at any time and upon any grounds not malicious, whimsical, or capricious.'

"The election conducted by the congregation was on Easter Sunday, April 9, 1944, when a larger number of the members was in attendance. The defendants were elected by a vote of 284 to 32. Counsel takes the position that if the conduct of the membership of April 2, 1944, was irregular and illegal the election of April 9, 1944 also is irregular and illegal. From the enunciated principles of the law, which we have heretofore stated, and from the record, we are persuaded to conclude that a majority of the members of the church expressed themselves at a meeting regularly held on April 2 and April 9, 1944, and that their voice is final and binding, unless we are to conclude that the conduct of the plaintiffs on Tuesday May 2, 1944, rescinding the actions of the members on April 2 and April 9, 1944, was an expression of a majority of the membership of the church then and there gathered at a meeting of the church.

"As we have stated, plaintiffs and defendants called meetings for Tuesday, May 2, 1944, at eight o'clock and when the chairman of the Old Board and chairman of the New Board attempted to call the meeting to order such disorder prevailed that it was the thought and judgment of the Old Board and its followers that a meeting could not be held in connection with the New Board and its followers of the church, and the former retired to the Sunday School auditorium where it passed

the resolution rescinding the conduct of the members of April 2 and April 9, and declared the pulpit vacant. At this point of the record we reach the first breach in the testimony. Plaintiffs' estimate of the total attendance of the members when all assembled in the main auditorium was from 500 to 550, and that about 300 went downstairs. Mr. A. R. Southard counted the number of members in attendance at plaintiffs meeting to be 354. Several young ladies counted the members present at plaintiffs' meeting. It was testified that there were 304 chairs in the basement and all were occupied and other persons standing. Defendants' estimate of the number present at the meeting was approximately 500, and that about 300 remained upstairs. Lt. Edward Beebe, a member of the church, counted 185 in attendance at plaintiffs' meeting in the Sunday School room. Patrolman Jess Smith, a member of the church, counted those downstairs at 223, and later 184; which number excluded children.

"The case presented by the record as to the number of members present on May 2d is seriously contradictory. Plaintiffs have not sustained the burden of proving that a majority of those assembled on the evening of May 2d retired to the Sunday School auditorium. In view of the conflict of the testimony on this issue we cannot say a majority of the members present on this night were in attendance at plaintiffs' meeting downstairs. It is an evident fact that the New Board and the pastor had approximately 300 who followed the New Board and the pastor. This was shown by the two previous votes. There is nothing in the testimony to suggest that any of the followers of the New Board had wavered in their allegiance to the New Board and the pastor. It is reasonable for us to conclude that the New Board and the pastor had a majority present at this meeting.

"We have carefully considered all the evidence in the case respecting the meetings and the elections, and are constrained to conclude that a majority of the members of the Latonia Christian Church, at a regular meeting, voted not to accept the pastor's resignation, and voted to vacate all offices of the church, and that on April 9, the defendants were duly elected by a majority of the members of the congregation. If the plaintiffs are dissatisfied with the conclusion we have reached they have not only their remedy of appeal but they may assemble at a regular meeting and by a vote of a majority

of the congregation of the church destroy what we have written here before the ink is dry on our opinion. Counsel will prepare a judgment in conformity with this opinion, dismissing plaintiffs' petition and sustaining the right of defendants to have turned over to the New Board the books, records, and property of said church, reserving to the plaintiffs their exceptions and right of appeal.''

While the court went to some length in discussing the conduct and result of the meeting of April 2, it impresses us that the April 9th meeting, held on Easter Sunday, was the efficacious meeting. If this meeting was not illegal or irregular, then it makes little difference what occurred at the former meeting. If the second meeting was regular, and we think it was, then the effect was to elect the New Board. If the congregation had the right to elect new elders, deacons and trustees, then the offices of their predecessors were thereby vacated.

We are impressed also, with the fact that in the short time between the meeting of April 2 and April 9th, and the institution of the suit, an appreciable number of persons had joined or rejoined the congregation, and there had been no withdrawals. Also with the fact that at both April meetings a number of the Old Board were present voicing no protest, except perhaps in the casting of a minority vote. That there was no ''snap judgment'' at least in the April 9th meeting is manifested by the fact that the Old Board in a meeting in March had in somewhat extended arguments discussed the controversial matters, and the meeting of April 2d was a fairly good storm signal. Nor can we escape the conclusion that the attitude of the Old Board existed because of the belief on the part of some of them that their long undisturbed tenure gave them a life-long hold on the stations. At least one member in the April 2d meeting so indicated when he made the statement that ''it was the Official Board that has financed the church. The main finances of the church have come from the official board and their families.'' This, with other remarks made at various meetings, would indicate that the Old Board assumed that it, and not the congregation, should control at least the church's worldly affairs. The trouble started when there was some indication that members of the congregation desired a more democratic procedure; some of them wanted a parsonage for the pastor, to be paid for from voluntary donations, but which some of the older members thought would not be

right since a parsonage would mean an "open house," and deprive the pastor of a more secluded life, and that the pastor was hired to preach and not to undertake to "run the church." There can be little doubt that matters should have been settled in a different manner, and without friction; that the congregation took the adopted method addresses itself to the congregation, and we are of the opinion that there was no such irregularity, or illegality in the meetings as would authorize us to upset the conclusions of the court.

Little need be added to what is expressed in the opinion, supra, as to the effect of the irregular May 2d meeting. The court's conclusion turned squarely on factual matters. The court sat, heard, and found from the proof that a majority of the members at that time did not vote to rescind the former actions. We think the best proof justified their conclusions. If we had no more than a doubt, it is our duty to give the weight to their finding. Upon consideration of the record before us we conclude that the court correctly decided the issues before it, hence the judgment is affirmed.