## Thomas, et al. v. Lewis, et al.

(Decided May 1, 1928.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

1. Religious Societies.—Church cannot control any civil right or duty, and civil power has no authority to secularize the church or interfere with exercise of its constitutional ecclesiastical jurisdiction.
2. Religious Societies.—Civil authority has jurisidiction over constitution of church as contract to protect members of church against unconstitutional invasion of civil rights whenever such invasion is attempted by the ecclesiastical government.
3. Religious Societies.—Church alone has jurisdiction of communion, faith, or discipline, and members must submiit to such rules and regulations governing these matters as may be prescribed by their church, but church does not always have exclusive jurisdiction over property or personal liberty or any right which is duty of civil power to protect.
4. Religious Societies.—When question arises involving right to use property belonging to church or ownership of such property, jurisdiction of civil courts may be invoked to determine property rights, in which case court must consider organization and government of church and restrictions in title to property.
5. Religious Societies.—In Baptist church every congregation governs itself and determines finally all matters pertaining to church, and all questions as to whether congregation has legally acted are questions that must be determined by the congregation itself unless restrictions are found on its rights to control its property; minority being always bound by majority of congregation.
6. Religious Societies.—In Baptist church, majority of congregation has ultimate power to determine all questions relating to government of local congregation, and hence there can be no permanent division or schism as long as church maintains its organization under rules adopted for its government.
7. Religious Societies.—Under Ky. Stats., sec. 322, providing that, in case of division, trustee shall permit each party to use church for

part of time, trustees referred to are those having control and management of property and having either legal or equitable title to property.

8. Religious Societies.—Under Ky. Stats., sec. 322, requiring trustees to permit each faction of church to have use of house of worship proportionately to number belonging to each faction, trustees are required to so act only as long as was required for ecclesiastical authorities to determine which faction was congregation or church.

9. Religious Societies.—Ky. Stats., 322, requiring trustees to permit each faction of church to use church proportionately to number of members belonging to each faction, applies only where property is conveyed or donated for use and benefit of church, title being vested in trustees for benefit of congregation, and has no application where local congregation obtains it own property by purchase, and where there is no trust created by donor or otherwise.

10. Religious Societies.—Court has no power to decide who ought to be members of Baptist church nor to determine whether church acting through its congregation has acted justly or unjustly, regularly or irregularly, such matters being for the congregation.

11. Religious Societies.—In controversy between opposing factions of Baptist church, judicial power arises only from conflicting claims of parties to church property and use thereof, which claims must be decided as other civil controversies.

12. Religious Societies.—In controversy between opposing factions of Baptist church, if congregation has irregularly removed officers, excluded members, diverted funds, or has been guilty of any other irregularity, correction of abuses rests with body of membership of church.

13. Religious Societies.—In controversy between opposing factions of Baptist church, members of church claiming to have been improperly excluded have only right to worship as constituent members of whole body and are entitled to use of church property according to will of majority regularly expressed, and hence selection of moderator by minority of members dissatisfied with management of church and organization of minority was irregular and without authority, and such minority were not entitled to use of church property.

MARK BEAUCHAMP for appellants.

W. G. DEARING and J. L. RICHARDSON for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

The Centennial Baptist Church was organized by colored members of that denomination in the city of Louisville more than 50 years ago. It held high the torch of Christianity until in 1926 when dissensions arose among the members, which have brought about an uncharitable feeling towards each other. The storm

broke without previous warning. An examination of the church records discloses that year after year the church had been functioning, and that its activities were devoted to the spread of the Gospel. The business affairs of the church were conducted in an orderly and intelligent manner. The membership grew until there were more than 800 members on the roll. The congregation owned valuable property. At a business meeting in June when the pastor was absent a motion was made that the pulpit be declared vacant. This meant that the pastor should be discharged from his pulpit. It was suggested that the matter should not be acted on without notice to the pastor, and action was postponed until a business meeting at a later date. Notice of this meeting had been given in the usual way, and according to the rules and regulations of the church. At the meeting when action was to be taken charges were preferred against the pastor in the nature of complaints, alleging unkind treatment by the pastor of individual members of the church. The pastor, Rev. T. J. Lewis, by virtue of his office, was moderator at all business meetings. He did not preside at this time, and the pastor of a neighboring church of the same denomination appeared and presided over the meeting. The question of dispensing with the services of the pastor, or sustaining the charges which had been made against him, was discussed and brought to a vote. There were 145 members present, and of that number 100 voted in favor of the pastor and 45 voted against him. Upon motion duly made and seconded, the action of the body was made unanimous. There were some in the congregation who expressed dissatisfaction at the result after the vote was taken, and they called for their letters. This means that they requested that they be dismissed from membership in the church. There were 22 of that number. The acting moderator explained to them that they could not obtain their letters at that time, but if they would give their names to the clerk of the church the letters would be granted later. Disorder arose in the congregation after the adjournment of the business meeting which reached such proportions that the police were called in to restore peace.

Later, letters were made out and mailed to the 22 dissatisfied members of the church, but the record shows that these letters were not granted by the church, and that the proceeding in their issuance was irregular. As the result of the meeting on this particular night, discon-

tent and dissatisfaction arose among the members. Some of the trustees and deacons resigned. Business meetings that were attempted later were disturbed by members of the congregation. The vast record of several thousand pages fails to disclose, in a satisfactory way, the cause of the disturbance. Some of the complaining members attempted to ask for what is known in Baptist parlance as a "mutual council." This means an advisory council selected from the membership of the church for the purpose of restoring peace in the church. Failing to obtain a mutual council, the dissatisfied members sought an "ex parte council." This means a council composed of members of some other church or churches before whom the complaining members might have their grievances heard. The church refused to take part in any such step, but the aggrieved members submitted their troubles, real or imaginary, to what they called an "ex parte council." An examination of the report of that council shows that the questions submitted to it related to the conduct of the pastor of the Centennial Baptist Church. Thereafter efforts were made to get the report of this "ex parte council" before the congregation, but these efforts failed.

It is needless to follow step by step the grounds of the dissension among the members of the church. The pastor was much at fault in his dealing with the dissatisfied members. Those who were in accord with the pastor are not free from blame. Some of the complaining members were removed from office and expelled in a highhanded and unbaptistic manner. The complaining members did not exemplify acts of Christian charity in all that they did. It is probable that all who participated in these unfortunate affairs were more or less blamable.

In December, 1926, the complaining members met on the front steps of the church. There were more than 150 present. Either a prayer meeting or a business meeting was going on at the time in the church. It is the claim of the appellants, who are the complaining members, that they endeavored to gain access to the church, but were denied that right by those who were then in possession. The evidence is not satisfactory on that point. Those engaged in conducting the prayer meeting or business meeting within the church had no more right to occupy it than did those who were on the outside, but they had the officers and members of the church who were conducting the business according to the rules and practices of a Baptist Church. The assembled members outside of the

church selected a moderator and proceeded to organize and elect officers of the church. This, of course, was irregular and without authority. After having organized, they proceeded to a neighboring Baptist Church and perfected their organization according to their idea of what was necessary. Soon thereafter this independent organization demanded the use of the property belonging to the congregation. Upon the denial of their request they proceeded to institute this suit. They obtained a temporary injunction giving them the right to occupy the church property a portion of the time. The case was finally prepared and submitted for judgment when the chancellor in an elaborate and well-considered opinion decided that they were not entitled to the use of the church property either all the time or a part of the time. The judgment of the chancellor is now before us for review.

The jurisdiction of courts of equity in certain cases involving the use of church property has been recognized by this court from the organization of this state. Gibson v. Armstrong, 46 Ky. (7 B. Mon.) 481; Gartin v. Penick, 68 Ky. (5 Bush) 112; Perry v. Wheeler, 75 Ky. (12 Bush) 541. The church cannot control any civil right or duty, and the civil power has no authority to secularize the church, or to interfere with the exercise of its constitutional ecclesiastical jurisdiction. The organic law of the church has been held to be a contract between all the parties to it, and, as these parties are entitled as citizens to the protection of the paramount Constitution of the state against all breaches of their contracts, civil authority has jurisdiction over the constitution of the church as a contract to protect the members of the church against unconstitutional invasion of their civil rights whenever such invasion is attempted by the ecclesiastical government. It must never be overlooked that the church alone has jurisdiction of communion, faith, or discipline, and the members must submit to such rules and regulations governing these matters as may be prescribed by their church, but the church does not always have exclusive jurisdiction over property or personal liberty, or over any right which it is the duty of the civil power to protect. Therefore, when a question arises involving the right to use property belonging to a church or the ownership of such property, the jurisdiction of civil courts may be invoked to determine property rights. In determining property rights under such circumstances courts must take into consideration the organization and gov-

crnment of the church and restrictions in the title to the property to determine where the rights of property lie.

Different Christian denominations have different forms of government. There are three forms of government which have gained prevalence in Christian communities, and which are still maintained. It may be that all classes of Christian churches may be brought under one or the other of these three forms of church government. One is the prelatical form in which the governing power resides in prelates or diocesan bishops and the higher clergy. To this form of government may be assigned the Roman, Greek, English, and most Oriental Churches. Another is the Presbyterian form in which the governing power resides in assemblies, synods, presbyteries, and sessions. To this form of government may be assigned the Scottish Church, the Lutheran, the various Presbyterian Churches, and the Methodist. Another is the independent or congregational form in which the body is self-governing, each single and local church administering its own government by the voice of the majority of its members. To this form may be assigned the Baptists, Congregationalists, Christian, and other independent churches. Much has been written through the ages about the form of church government, those adhering to any particular form claiming that it comes down from the apostolic churches. Baptists hold that each separate, local church is an independent body governing itself according to the laws of Christianity as found in the New Testament. They hold that every local church is independent of all other churches and of all other persons so far as administration is concerned. The Baptists hold that they owe comity and fellowship to all, but allegiance and submission to none. The government is administered by the body of the members where no one possesses a pre-eminence of authority, but each member has equality of rights, and where there are differences in matters of opinion the majority decides.

A Baptist Church has certain officers who are the servants of the church. The chief officers are pastors and deacons, but for the purpose of assisting in administering the affairs of the church, clerks, trustees, messengers, and such others as may be deemed necessary by the congregation are recognized. No officer is given any greater voice in the affairs of the church than the humblest member.

A Baptist Church is a pure democracy, and in all matters relating to its government, election of its officers, its articles of faith, and the management of its affairs the local congregation present and voting at a meeting regularly held, on any question, determines the matter finally until the decision is likewise revoked by the congregation. The local congregation determines, by its own by-laws, resolutions, or orders, the time and place as well as the method of ascertaining the will of the majority. From the determination of a question by a majority of the congregation there is no appeal to any ecclesiastical authority. A Baptist congregation, as long as it acts as a local church functioning under its own laws and regulations, may say to all mankind that, "Mine are the gates to open and mine are the gates to close." No power may interfere with the authority of the local congregation so exercised.

The pastors, deacons, trustees, and other officers have no authority except that derived from the congregation. The trustees may not authorize the use of the property at any time or for any purpose in opposition to the will of the majority, unless as hereinafter pointed out.

In rare instances where the local congregation has ceased to function, the jurisdiction of courts may be invoked to determine property rights, but no such question is presented by this record. All questions as to whether the congregation has legally acted are questions that must be determined by the congregation itself, unless restrictions are found on its rights to control its property. The minority is always bound by the majority in a Baptist congregation.

But it is suggested that section 322, Ky. Stats., controls when there is a schism or division in a Baptist Church, and that the use of the property must be divided among or between the warring factions. It seems to be contended that this section of the statute applies to Baptist Churches because there are neither prelates, diocesan bishops, assemblies, synods, presbyteries, or sessions having ecclesiastical authority over the affairs of a local Baptist Church. The opinion in the case of Gibson v. Armstrong, supra, completely answers any such argument. In that case it was held that if section 322 of the Ky. Stats. applied to Baptist Churches, it also applied to other churches. That case contains a most exhaustive discussion of the questions involved in this case. That involved a dispute over a Methodist Church building in

the city of Maysville in the days when the Methodist Episcopal Church was divided into the northern and southern branches. The court in that case held that as long as the local church organization could be identified as the organization having continuity from the past it was entitled to the exclusive use of the church property and that dissenting members were not entitled to interfere with that use. It would be an interminable task to differentiate one opinion from the other among the many which have been written by this court touching divisions in local congregations of churches.

The appellants cite and rely upon three cases in support of their contention that they are entitled to the use of the church property either all or a part of the time. One is Poynter v. Phelps, 129 Ky. 381, 111 S. W. 699, 33 Ky. Law Rep. 887, 24 L. R. A. (N. S.) 729. A division arose there in the minds of the members over the adoption of a resolution for the government of the church. The court in that case appears to have been unable to determine whether the majority of the congregation had spoken in the manner provided by the laws and usages of the church. The court said in its opinion that the factions were of about equal numerical strength, and that neither faction had withdrawn from the church, and that each claimed to constitute a majority of the congregation. The court further said in that case that a Baptist Church is controlled in its management by a majority of voices. Owing to the peculiar situation found in that record, and in view of the further fact that the church property was only used once or twice a month by the congregation, the court allowed the use of the church property by both factions at different times. The learned chancellor below expressed the opinion that the contention of appellants was supported by that case, but it was the only case among the many, which he found supporting the contention of appellants. We do not believe that the case we have before us brings it within the law announced in that case even if the opinion there is sound. A court of equity without doing violence to the rights of either faction, and where a majority of the church had not determined the question bringing about the dissension, permitted each faction to use the church property. Under all of the circumstances, the decision was not unwise.

Another case relied on by appellants is that of Cox v. Prewitt, 197 Ky. 716, 247 S. W. 976. The congregation in that case did not constitute a Baptist Church. In that

case this court allowed both factions to use the church property apparently on the ground that the more numerous faction was only asking the use of the property for half of the time. The organization of the congregation discussed in that case as pointed out by the chancellor was materially different from the organization of a Baptist Church.

Another case relied on is that of Rose v. Briggs, 205 Ky. 619, 266 S. W. 236. The organization of the congregation discussed in that case was in many respects dissimilar to the organization of a Baptist Church.

Another case similar to the two last cited is that of Ennix v. Owens, 209 Ky. 19, 271 S. W. 1091. These cases may all be distinguished from the case before us and will not be construed to announce a rule contrary to the rules herein announced. On the other hand, appellees rely on the case of Bogard v. Boone, 200 Ky. 572, 255 S. W. 112, which involved the Mt. Zion Baptist Congregation at Paducah. In that case it was held that in a Baptist Church the voice of the majority was supreme and its decision on all questions final. When the majority at any meeting regularly held decided a question, the whole body of the church was bound thereby whether present or not, according to the principles announced in that case. The conclusion of the court on that point is supported by a number of authorities cited in the opinion. From what has been said and from an examination of the authorities cited in this opinion and many others to the same effect written by this court, it will be seen that there can be no permanent division or schism in a Baptist Church as long as it maintains its organization under the rules and regulations adopted for its government. That necessarily must be so if a majority of the congregation has the ultimate power to determine all questions, and we believe there is no decision of this court where it has ever been held that the majority does not have ultimate power and authority to determine all questions relating to the government of the local congregation.

But appellants point out that section 322, Ky. Stats., is contrary to the views herein expressed. That section is as follows:

> "In case a schism or division shall take place in a society, the trustees shall permit each party to use the church and appurtenances for divine worship

a part of the time, proportioned to the members of each party. The excommunication of one party by the other shall not impair such right, except it be done, bona fide, on the grounds of immorality.''

The determination of the meaning and purposes of this section carries us far back into the days of antiquity. A reading of the section itself should show to the discriminating mind that it does not stand alone. It directs that the trustees shall permit each party to use the church for divine worship. The inquiring mind would at once ask what trustees, where do they come from, by whom were they appointed, and from what source do they obtain their power? These are pertinent inquiries. A Baptist Church does not necessarily have trustees, therefore it is apparent that the statute had no reference to the servants of a Baptist Church who are ordinarily designated as trustees. The statute refers to trustees who have the control and management of the property, and who must therefore have either the legal or equitable title to the property. Such is not ordinarily true in a Baptist Church, but, of course, any congregation might be the beneficiary under a trust established by some donor for its benefit. In such cases the court would require the trustees to perform their duties and carry out the trust for the use of the beneficiary in accordance with the terms of the instrument establishing the trust and might apply the statute in such cases. This section of the statute is a part of an act relating to charitable uses and religious societies last enacted in 1893. It was then brought over from the General Statutes, and the General Statutes brought it over from the Revised Statutes, and by tracing it back to its source we find that this act substantially as it now appears was enacted by the General Assembly in 1814. It was enacted at that time as a modification of the statute of 43 Elizabeth which was in force in this state. It was held in the case of Gass & Bonta v. Wilhite, 32 Ky. (2 Dana) 170, 26 Am. Dec. 446, that the statute of 43 Elizabeth was in force in this state at the time of the passage of the act of 1814 by the General Assembly. That statute related to charitable uses, and this court found in the case, supra, that property donated to a religious society was donated for a charitable use. The statute of Elizabeth had for its main object the giving of chancery courts the power to inquire into the facts touching the donation of lands or money for charitable purposes and enforcing the application of

funds according to the intention of the donor. Chancery courts were thereby vested with the power to bring trustees to account and compel them to apply the property in accordance with the terms of the instrument creating the trust and to effectuate the intention of the donor. The statute recited that benevolent persons had theretofore given lands, money, and other things for the relief of the aged, impotent, and poor people, for the maintenance of schools of learning, and for many other purposes, which lands and money or other things had not been employed according to the charitable intent of the givers by reason of frauds, breaches of trust, and negligence on the part of the trustees. Prior to that statute the acts of the trustees could not be inquired into by the courts.

The statute of 23 Henry VIII (chapter 10) related to trusts established for the use and benefit of parish churches, chapels, church wardens, guilds, fraternities, companies, and brotherhoods erected by or made of devotion, or by common consent of the people, without any corporation. The statute recited that such trusts had resulted in losses, inconveniences, and prejudices in the same manner as in mortmain. It was held that this statute, however, did not apply to alienations in trust for certain charitable uses. Among the charitable uses to which it did not apply were such as maintenance of a school, relief of maimed soldiers, sustenance of poor people, reparation of churches, and other like charitable uses. It was construed to apply only to superstitious uses.

Turning now to section 317 of the Kentucky Statutes, which is the first section of the act of which section 322 is a part, we find that all grants, conveyances, devices, gifts, appointments, and assignments that had been previously made or which should be thereafter made, in due form of law, of any lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money, stock, or choses in action for the relief or benefit of certain persons and objects, among which is specifically mentioned churches, were validated by the terms of said section, if the grant, conveyance, devise, gift, appointment or assignment should point out with reasonable certainty the purposes of the charity and the beneficiaries thereof except in so far as such grants, etc., were restricted by other provisions of the act. This section was a part of the act of 1814. The next section contained the provision that no charity should be defeated for the want of a trus-

tee or other person in whom the title might vest and con-
ferred upon courts of equity the power to uphold such
donations by appointing trustees where no trustees were
named, or by taking control of the fund or property and
directing its management and settling who was the bene-
ficiary thereof. The next section restricted the quantity
of land which might be so donated to any church or so-
ciety of Christians. A subdivision of that same section
conferred upon the church or the society, either before
or after the creation of the charity, power to appoint not
exceeding three trustees who should be vested with the
title to the property, either legal or equitable, and the suc-
cessors of such trustees should likewise be vested with
the title, either legal or equitable, to the property. An-
other subdivision of the same section gave the trustees,
or a majority of them, the power and authority to insti-
tute and prosecute suits to recover any property, real or
personal, belonging to the church or society. Then fol-
lowed another subdivision that, if any schism or division
should take place in the congregation or church from any
other cause than the immorality of its members, nothing
in the act should be so construed as to authorize the trus-
tees to prevent either of the parties so divided from using
the house or houses of worship for the purposes of devo-
tion a part of the time proportioned to the number of
each party. Then followed another proviso that nothing
in the act should be construed to authorize the minority
of any church having seceded from or having been ex-
pelled or excommunicated from the church or congrega-
tion to interfere in any manner with the acts of the
church or the congregation or the major part thereof.

These provisions in the act of 1814 did not attempt
to interfere in any way with the right of the church or
congregation to control its own affairs. It did deny,
however, the trustees the right to prevent any faction
from using the house of worship for purposes of devotion
a part of the time proportionate to the number of each
faction. The next proviso, however, shows clearly that
it was the purpose of the act to leave the control and
management of the house of worship to the majority of
the congregation. This court so held in the case of Curd
v. Wallace, 37 Ky. (7 Dana) 190, 32 Am. Dec. 85. As we
gather from that decision, the purpose of the act was to
take from the trustees the power to interfere with the
control of the church property by the different factions of
the congregation as long as each continued to profess

the Christian religion and neither had been convicted by the other of irreligion. The court found that it was the intention of the act to leave the factions to ecclesiastical discipline and authority. When we look at the proviso in the light of conditions and circumstances, we reach the conclusion that the trustees having title to the property must control and manage it in accordance with the intention of the donors, and if a division or schism should arise in the church the trustees were not given the power to deny to any faction the right to use the house of worship until the matters should be finally decided by ecclesiastical authority. In the case of a church having a congregational government the question might have been speedily decided, but in the case of churches having the prelatical or Presbyterian form of government the controversy might not be decided for many months or even years. Prior to the time of the decision by the ecclesiastical authority having the right to decide, the trustees could not deny either party the right to use the house of worship.

The act of 1814 was amended and re-enacted in 1835, and again in 1850, and again in 1893. Obviously the provision of the statute of 1814 denying the trustees the power to discriminate between the factions had not proved satisfactory, therefore section 322 of the present statutes was enacted as a substitute for the original section of the same subject. This section made it incumbent on the trustees to permit each of the factions to have the use of the house of worship proportionately to the number belonging to each faction, but that meant only as long as was required for the ecclesiastical authorities to determine which faction was the congregation or church.

Neither must it be overlooked that the provision of the statute has no application to a case such as we have before us. The statute only applies where property is conveyed or donated for the use and benefit of a church, the title being vested in the trustees for the use and benefit of the congregation. Where the local congregation obtains its own property by purchase or otherwise, and where there is no trust created by a donor or otherwise, this section of the statute has no application. Under the statute of Elizabeth, courts of chancery were given the power to inquire into the administration of the trust falling under the statute of charitable uses. and unless the property of the church is held in trust by the congrega-

tion under some instrument or authority creating the trust, the provisions of chapter 17 of the Ky. Stats., which includes section 322, have no application. We believe an examination of the learned opinions of this court, many of them of great length, fully sustains this view. Gibson v. Armstrong, 46 Ky. (7 B. Mon.) 481; Humphrey v. Burnside, 67 Ky. (4 Bush) 215; Lewis v. Watson, 67 (4 Bush) 228; Gartin v. Penick, 68 Ky. (5 Bush) 110; Hadden v. Chorn, 47 Ky. (8 B. Mon.) 70; Berryman v. Reese, 50 Ky. (11 B. Mon.) 287; Cahill v. Bigger, (8 B. Mon.) 211; McKinney v. Griggs, 68 Ky. (5 Bush) 401, 96 Am. Dec. 360; Lucas v. Case, 72 Ky. (9 Bush) 297; Kinkead v. McKee, 72 Ky. (9 Bush) 535; Newman v. Proctor, 73 Ky. (10 Bush) 318; Perry v. Wheeler, 75 Ky. (12 Bush) 541; Bennett v. Morgan, 112 Ky. 512, 66 S. W. 287, 23 Ky. Law Rep. 1824.

In the last cited case this court, quoting from Shannon v. Frost, 42 Ky. (3 B. Mon.) 253, in referring to the act of 1814, said:

"The chief object of the enactment seems to have been to prescribe a mode for transmitting to new trustees the legal title to church property after the death or removal of the trustees to whom it had been originally conveyed, and to vest such appointees with all the powers of their predecessors, qualified, as to the former, by the provisos. The act does not, in either letter or purpose, apply to a church or the trustees of a church, when the church property is still held by the trustees or the heirs of the trustees to whom the title was first conveyed or devised as a charity." Igleheart v. Rowe, 47 S. W. 575, 20 Ky. Law Rep. 821.

This court does not have the power to decide who ought to be members of the church, and neither does it have the power to determine whether the church, acting through its congregation, has acted justly or unjustly, regularly or irregularly. These are matters that must be determined by the congregation. Our only judicial power arises from the conflicting claims of the parties to the church property and the use of it, and these claims we must decide as we do all other civil controversies brought to this court for final determination.

If the congregation has irregularly removed officers, excluded members, diverted funds, or has been guilty of any other irregularity, the correction of such abuses rests with the body of the membership of the church. The appellants who claim that they have been denied the right to worship in the church probably have as much right to worship there as the others, but only as constituent members of the whole body. They are entitled to the use of the church or other property of the church according to the will of a majority regularly expressed.

If the contending factions in this church are in truth and in fact Christians and practice the teachings which they profess, they will meet together in brotherly love and decide in what way they can best carry on the work of the kingdom of God. If the appellees and those who adhere to their faction are Christians and believe in the principles of Christianity as taught and practiced down through the ages, they will hasten to welcome back into the fold those who have temporarily wandered away. If they are not Christians, they will not welcome them back, and the responsibility for the disruption of a great church will rest on them. On the other hand, if the appellants are Christians and believe in the principles and practices of Christianity, they will hasten back into the fold of the church. If they are not Christians, they will not do so, and the responsibility for the impairment of the services of this church will rest on them. If this church is another church in Pergamos where Satan has his seat, as was pointed out by the angel to John when he was in the Isle of Patmos, nothing can be done until Satan is expelled. It is probable that he cannot be expelled by one of the factions alone, but it may require the united effort of all of the brothers dwelling together in peace and amity.

The appellees are complaining because the chancellor required the appellants and the appellees each to pay their own cost. The reasons that the chancellor advances for his judgment on this point are sufficient.

Judgment on both the original and cross appeals is affirmed.

Whole court sitting.