# Clapp et al. v. Krug et al.

## And Five Other Cases.

(Decided December 17, 1929.)

(As Modified on Denial of Rehearing January 28, 1930.)

C. C. GRASSHAM, M. C. ANDERSON and TURNER & CREAL for appellants.

J. D. MOCQUOT, BEN S. ADAMS and JACK E. FISHER for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Affirming.

The First Baptist Church of Paducah has about 1,500 members, and has had many years of Christian usefulness. In addition to its usual domestic or local activities, the church maintains one or more missionaries in the home and foreign fields. Recently dissensions and strife have arisen among the members, and between the pastor and the board of deacons, save one. This condition has been intensified into one of fervid rancor and active strife, which is seemingly at variance with Christian precepts and practices. The result has been the institution of nine lawsuits, six of which are brought to this court as above styled. They all arise from the same state of facts, and will be considered and decided together.

The appellants are the Reverend Dr. D. B. Clapp, pastor of the church, and about 300 of his adherents, and the appellees are the deacons, except one, and several hundred other members allied with them.

The first styled appeal was filed by the church clerk, C. F. Krug, to prevent interference in the discharge of his duties. The last one was filed by the choir leader and other salaried employees, seeking to have the court hold an election for the choosing of temporary officers to maintain the finances and the physical properties of the church pending a settlement of this litigation. It has now become a moot case. The other appeals involve the civil rights of the pastor under his employment and of the adherents of the respective factions with reference to the use and control of the property. The purposes sought to be accomplished by all these appeals are essentially the same.

It is well to note that civil courts are not concerned with controversies or questions of a purely ecclesiastical nature, for there is a constitutional guaranty of freedom of religious profession and worship, as well as an equally firmly established separation of church and state. The

rule has been adhered to by the courts of this commonwealth with a steady resolution, and they have declined to intervene, except where there has arisen out of such church controversies an invasion or violation of the civil rights of the members. When that situation appears the courts will consider in measuring those rights the form of the particular church government, its rules and regulations and its customs and usages.

In Thomas v. Lewis, 224 Ky. 307, 6 S. W. (2d) 255, 258, may be found an interesting treatise on the different general forms of church government, and especially that of Baptist churches, that case involving a controversy between members of a congregation of that denomination. It is there said:

"A Baptist Church is a pure democracy, and in all matters relating to its government, election of its officers, its articles of faith, and the management of its affairs the local congregation present and voting at a meeting regularly held, on any question, deter- mines the matter finally until the decision is likewise revoked by the congregation. The local congregation determines, by its own by-laws, resolutions, or orders, the time and place as well as the method of ascertaining the will of the majority. From the determination of a question by a majority of the congregation there is no appeal to any ecclesiastical authority. A Baptist congregation, as long as it acts as a local church functioning under its own laws and regulations, may say to all mankind that, 'Mine are the gates to open and mine are the gates to close.' No power may interfere with the authority of the local congregation so exercised. The pastors, deacons, trustees, and other officers have no author- ity except that derived from the congregation."

We proceed now to a recitation of the facts, which will be as brief and general in character as seems consistent with an intelligent consideration of the legal rights involved.

There appears to have been a progressively widening breach, due, as the appellants say, to a spirit of worldliness among some of the members, from which the pastor has striven to deliver them, but, as appellees say, to a demand for a change in the pastorate for other reasons. From the pulpit on June 2d, the pastor made a statement

in the nature of a challenge, and at the regular meeting of the deacons on the evening of June 3d he was asked to resign. This he refused to do. At the regular business meeting of the congregation on the 5th, at which the pas·tor, who was also the moderator of the church, presided, not the best of feeling and decorum were manifested, and a close adherent of the pastor made written charges against twenty members of the church, including the church clerk, and nine of the deacons, accusing them of violating the church covenant, heresy, and contempt of church. The basis of these charges was that at the previous February meeting of the congregation the parties had made an effort to have restored to fellowship five persons, who had theretofore been expelled from the church for dancing. Dr. Clapp interpreted the church rules to be that, when a member has charges preferred against him, he is automatically suspended from his relationship with the church until those charges have been disposed of. So, after these accusations were lodged, the pastor refused to give recognition to any of these officers and members. The nature of the motives actuating these charges is no concern of the courts. It is our concern only whether the action—as judged by the church law—illegally affected a civil or contract right.

The next regular meeting of the deacons was held on July 8th. On the 5th they sent a letter to every member of the congregation urgently inviting them to attend this meeting, as matters of vital interest to the church would be considered. The pastor announced from his pulpit on Sunday the 7th that there would be a prayer meeting in the auditorium at the same hour on the 8th. He caused notice also to be given in the public press; and in the church bulletin distributed among the Sunday congregation he referred to this as a mass meeting. In the bulletin he elaborated upon this called meeting, and therein stated: "Any meeting held outside the one announced in this paper will be without authority and any action taken will be illegal and out of order. Any person attending such meeting will be in contempt of the church." This admonition was made notwithstanding the stated rule of the church, appearing in the same bulletin, provided that the regular monthly meeting of the deacons would be held at the same hour.

Accordingly, the deacons held their regular meeting in the accustomed place with a number of the congrega-

tion present. At that meeting a formal resolution was adopted recommending to the church that the pulpit be declared vacant and that the pastorate of Dr. Clapp cease immediately, the vote to be taken by "written ballot." At the meeting held by the pastor in the auditorium at the same time it appears that the charges preferred against the officers and other members at the meeting of June 5th were acted upon, and, having failed to respond, they were declared excluded from church fellowship. However, during the afternoon of that day the clerk, C. F. Krug, sole appellee in the first styled case, had secured a restraining order from the circuit judge restraining the pastor from interfering with him in his official capacity. A temporary injunction having the same effect was thereafter made permanent, and the first stated appeal is from that judgment.

At the regular church business session on the evening of July 10th, it was generally understood that the opposing claims of the two parties were to be brought into conflict, and that the controversy would be brought to a head. The crowd which gathered filled the room, including the aisles and windows. The meeting was held in the Sunday School room, the usual and customary place. Dr. Clapp, as moderator, called this meeting to order, but, upon suggestion that he should vacate the chair under the circumstances, he agreed to do so. Nominations were made of two men to act as temporary moderator or presiding officer. The pastor protested against the church clerk putting the vote, but reluctantly yielded. The clerk declared Ben S. Adams, who had been placed in nomination by those opposed to the pastor, elected, a vigorous protest resulting. The recommendations of the deacons with respect to declaring a vacancy in the pulpit being presented, a vote of the congregation was taken as to the method of voting to be followed on this resolution. The acting moderator declared the majority to be in favor of voting by secret ballot, and this was protested. Tellers were thereupon appointed, and they distributed ballots among those present.

After the ballots had been collected and the tellers had retired to count them, the pastor declared that he would assume the chair, as he had been advised that the restraining order of the court did not prohibit him doing so. He thereupon announced that the meeting would be adjourned to the auditorium upstairs, and called upon

those present to follow him, which a large number did. A meeting was there held, and a vote taken on the resolution of the board resulted in its unanimous defeat. Below the tellers reported the vote stood 306 in favor of the resolution and 98 against it.

We are not concerned with the validity of the meetings and actions leading up to the alleged expulsion of the deacons and members of the church, except as they relate to the appellee Krug in his official capacity as church clerk. It appears that Krug was under employment and received for such services a salary; hence a contract right is affected which gives the court jurisdiction of his complaint. Gartin, etc. v. Penick, etc., 68 Ky. (5 Bush) 122. As to the other members, no civil rights appear to have been infringed, and, if they have been wrongfully excluded, the correction rests with the body of the membership of the church, for, as stated, in Gibson, etc. v. Armstrong, 46 Ky. (7 B. Mon.) 481, a dispute in regard to the fact of membership or the rights pertaining to that relation presents an ecclesiastical question, and the decision of the tribunals of the church will be regarded as final by the civil powers. See, also, Thomas v. Lewis, supra, and 23 R. C. L. 442, 449.

As stated, the charge against appellee Krug was first presented at a church meeting held on June 5th. The appellants maintain that it has been and is now the rule of the First Baptist Church of Paducah, and other churches of that denomination, that the mere filing of charges automatically suspends those charged from church fellowship and official station until they shall have been purged of their guilt either by being declared innocent or, if guilty, by subjection to discipline or by pardon of the church. Numerous affidavits of ministers and others are filed in support of this contention. On the other hand, just as many and as authoritative affidavits declaring the contrary were produced, including three eminent professors of the Southern Baptist Theological Seminary. There does not appear to have been any written rule of this congregation regarding such matter. We agree with the learned special chancellor, who says in his opinion:

"It seems that the better reason rests with those supporting the negative of this proposition. Otherwise one charged would suffer deprivation of his rights before trial and would have imposed upon him the burden of proving his innocence. More serious

than this, however, is the fact that such a rule or regulation as is contended for by the pastor would enable one member so disposed to place the congregation in a position where it could not transact business or proceed with the church work at all. A member of one faction might easily make charges against every member of the opposing faction, and vice versa, thus completely tying the hands of every member of the church. I am consequently inclined to hold that the mere making of charges against a member or any number of members does not automatically deprive such parties of all the rights of membership.''

Therefore appellee Krug's suspension was properly held illegal. It remains to be seen whether subsequent actions legally affected his rights.

It is well established by the proof that there was a written rule of the church existing at the time that all matters requiring a vote of the congregation, except the granting of letters of dismissal and reception of members, should be presented and considered by the pastor and board of deacons, and approved or disapproved by that body before being presented to the church for action, and that this regulation should not be repealed or modified without 30 days' notice to the church. The meeting held by the pastor on the evening of July 8th was not called by him in his capacity of moderator, and cannot be construed as a business meeting of the church. It is designated in the notices as a prayer meeting and mass meeting. It can hardly be said that the resolution passed at that meeting that it should be in lieu of the regular business session which would properly be held on Wednesday night the 10th was of any effect. Dr. Clapp opened that regular meeting, and many of those present on the 8th participated in it. There was nothing said by any one with reference to the meeting of the 8th. The preferment of the charges against Krug never having been submitted to the board of deacons before presentation, and the meeting at which they were sustained not being held in conformity with the church rules, the action of those present in voting to expel the church clerk and deprive him of his office was illegal. The lower court properly granted the prayer of the petition of appellee Krug, and permanently

enjoined appellants from interfering with him in the discharge of his official duties.

Reverting to the church meeting of the 10th, in which the pastor was deposed, the validity of which determines the other appeals. The appellants contend it was illegally conducted, in that their nominee for presiding officer was rightfully elected but deprived of the place; that voting by ballot was illegal, and, in any event, a majority voted against using the ballot on the question of deposing the pastor; and, finally, that, had such ballots been fairly distributed, voted, collected, and counted, they would have disclosed that the resolution was defeated. It is also insisted that those who retired to the auditorium, being a majority, constituted the regular business session, and their action in sustaining the pastor should be upheld.

The affidavits filed by the appellants—and there are approximately 300 of them—are to the effect that the declaration of Mr. Adams as presiding officer was fraudulent, high-handed, and contrary to the correct result of the election; it being said that the adherent of Dr. Clapp received two-thirds of the votes cast. About the same number stated that it was a correct decision, and that Mr. Adams was regularly and fairly chosen. The same irreconcilable conflict exists as to whether the majority favored voting viva voce or by ballot on the resolution dismissing the pastor. Numerous affidavits were filed by appellants to the effect that it was contrary to the custom in this church and to prevailing Baptist law to vote otherwise than verbally, by uplifted hand, or by standing. Hence it is contended that the ballot method was illegal and ineffective. The seminary professors and many other authorities say that the practice is legal. It is shown in the record that voting by ballot is not unknown in this church, for it is proved that in the Sunday School that method has been used. But appellants say that the Sunday School and church are separate and distinct organizations. It has often been said generally that the Sunday School is an arm of the church. It is in reality the church itself in action in its most fertile field. Regardless of the rule or custom, in this case the question of the method to be pursued was submitted to the congregation (which, as has been stated, is self-determining), and the presiding officer ruled that those present favored voting on the main question by secret ballot, and the appel-

lants, in our opinion, did not sustain the burden resting on them to show that decision was wrong.

It would serve no useful purpose to review in detail the acrimonious charges of fraud in the conduct of this vote nor the equally vigorous denials and counter charges of misconduct. We have carefully considered all the evidence respecting this meeting, and must sustain the chancellor in his decision that those who remained in the customary place in which it was held constituted a regular business meeting of this congregation, and that the result expresses the will of the church as there disclosed, and that must prevail. In a Baptist Church the voice of the majority is supreme, and its decision on all questions is final. When a majority at any meeting regularly held decides a question, the whole body of the church is bound thereby whether present or not. Thomas v. Lewis, supra. "That necessarily must be so," says the opinion, "if a majority of the congregation has the ultimate power to determine all questions, and we believe there is no decision of this court where it has ever been held that the majority does not have ultimate power and authority to determine all questions relating to the government of the local congregation."

The lower court properly gave judgments to the respective parties entitled thereto.

The judgment enjoined Dr. Clapp from attempting to conduct religious services and from exercising the duties and privileges of minister or pastor, or as a moderator of the church, at any time. The phrase "at any time" was probably an inadvertence. The judgment is to be construed as enjoining the defendant from performing those services under the contract of employment involved in this litigation, and not as restraining him in that regard, should the congregation call or employ him in the future exercise of its powers.

We recall that in the years that have passed much blood has been spilled in defense of religious views; and the maintenance of religious beliefs and rights seems peculiarly to be productive of angry passions and acrimony. In this instance it appears to an unbiased mind that the differences which have arisen and the bitterness that has been engendered have assumed a magnitude out of all proportion to the initiatory causes, and the possibilities of spiritual disaster and destructive effect are so

grave as to call for the exercise of the Christian graces of reconciliation, forbearance, brotherly love, and unity, according to the admonition given by the Apostle Paul to the church at Corinth.

The judgments appealed from are affirmed.