## Martin et al. v. Kentucky Christian Conference, Inc., et al.

(Decided June 22, 1934.)

A. N. CISCO for appellants.

SAM SPARKS for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

On January 1, 1912, James Martin and his wife, Jane Martin, conveyed to Willis Kaser, Hiram Keesee, and James Martin, Jr., trustees, and their successors, a small tract of land in Boyd county by deed containing the following provisions:

"It is hereby understood and agreed by all the parties this lot of land is deeded by the parties of the first part to the parties of the second part as Trustees of the Christian Church for the purpose of building a church for worship for the Christian Church, and when the Christian Church or their successors fail to use it for that purpose the ground and all improvements placed there on it is to revert to the grantors herein mentioned or their heirs."

Through the efforts of G. W. Renfroe, subscriptions were taken and a church was built. For a number of years the church and its minister were affiliated with the Kentucky Christian Conference. Its membership was small, services were not regularly held, and there was not much life in the church. Finally a regular pastor was called who added to the membership and put new life into the church. At the time this controversy arose the

church membership had largely increased, and the average Sunday school attendance was about 125. In the year 1930 the new minister withdrew from the Kentucky Christian Conference, and the church itself by practically a unanimous vote also withdrew from the Conference and decided to have communion services every Sunday. Thereupon G. W. Renfroe and a few of his sympathizers asked permission to hold a protracted meeting in the church. Permission was declined on the ground that a meeting had just been concluded. Thereafter the Kentucky Christian Conference, Inc., G. W. E. Wolford, president, W. E. Robinson, secretary, and G. W. Renfroe, chairman of the executive board, brought this suit against Virgil Martin, James Martin, Charles Webb, James Webb, "and all other persons associated with them in an independent church organization," to restrain them from interfering with plaintiffs in the use of the church property. On final hearing the court adjudged that the church property was the property of the Kentucky Christian Conference, and enjoined the defendants from interfering in any manner with the title, use, possession, or control of the property, and from claiming or asserting title thereto. The defendants appeal.

The sole ground of recovery is that the Christian Church as represented by the defendants and others is a different organization from the Christian Church mentioned in the deed. The argument is that the Christian Church mentioned in the deed was organized by Barton W. Stone, and is the organization sometimes known and derisively called the "New Light" Church. On the other hand, those now in control of the church represent the Christian Church known and derisively called the "Campbellite" Church. While some reference is made to the effect that the "Campbellite" Church did not practice foot washing, it does not appear that that was a regular and uniform practice of the "New Light" Christian Church. Indeed, the claim is made that the chief difference between the two organizations is that the "Campbellite" Christian Church has communion service every Sunday.

The record discloses that in the year 1804 Barton W. Stone and others determined to withdraw from and dissolve the Presbytery of Springfield, sitting at Caneridge, in the county of Bourbon, and to that end signed and executed what is denominated the "Last Will and

Testament of Springfield Presbytery." The pertinent provisions of that instrument are as follows:

"Imprimis. We will, that this body die, be dissolved, and sink into union with the Body of Christ at large; for there is but one body, and one Spirit, even as we are called in one hope of our calling.

"Item. We will, that our name of distinction, with its Reverend title, be forgotten, that there be but one Lord over God's heritage, and his name one.

"Item. We will, that our power of making laws for the government of the church, and executing them by delegated authority, forever cease; that the people may have free course to the Bible, and adopt the law of the Spirit of life in Christ Jesus.

"Item. We will, that candidates for the Gospel ministry henceforth study the Holy Scriptures with fervent prayer, and obtain license from God to preach the simple Gospel with the Holy Ghost sent down from heaven without any mixture of philosophy, vain deceit, traditions of men, or the rudiments of the world. And let none henceforth take this honor to himself, but he that is called of God, as was Aaron.

"Item. We will, that the church of Christ resume her native right of internal government—try her candidates for the ministry, as to their soundness in the faith, acquaintance with experimental religion, gravity and aptness to teach; and admit no other proof of their authority but Christ speaking in them. We will, that the church of Christ look up to the Lord of the harvest to send forth laborers into his harvest; and that she resume her primitive right of trying those who say they are apostles and are not.

"Item. We will, that each particular church, as a body, actuated by the same spirit, choose her own preacher, and support him by a free will offering, without a written call or subscription—admit members—remove offences; and never henceforth delegate her rights of government to any man or set of men whatever.

"Item. We will, that the people henceforth take the Bible as the only sure guide to heaven; and as many as are offended with other books,

which stand in competition with it, may cast them into the fire if they choose; for it is better to enter into life having one book, than having many to be cast into hell.

"Item. We will, that preachers and people, cultivate a spirit of mutual forbearance; pray more and dispute less; and while they behold the signs of the times, look up, and confidently expect that redemption draweth nigh.

"Item. We will, that our weak brethren, who may have been wishing to make the Presbytery of Springfield their king, and wot not what is now become of it, betake themselves to the Rock of Ages, and follow Jesus for the future."

About the same time Barton W. Stone inaugurated the movement that resulted in the organization of the "Christian Church." The distinctive principles of the Church were:

"The Lord Jesus Christ as the head of the church.

"Christian our only name.

"The Bible our rule of faith and practice.

"Individual interpretation of the Scriptures, the right and duty of all.

"Christian character the test of fellowship.

"The union of all the followers of Christ, to the end that the world may believe."

Not long thereafter a similar movement was inaugurated by Alexander Campbell, who entertained substantially the same views as Barton W. Stone, and he and his followers, though sometimes derisively called "Campbellites" or "Reformers," also took the name of "Christians," and called their organization the "Christian Church." At Lexington, Ky., in the year 1832, delegates from many, though not all, of the two churches met and formed a union. Referring to this union, Barton W. Stone in his autobiography has the following to say of Alexander Campbell:

"He boldly determined to take the Bible alone for his standard of faith and practice to the exclusion of all other books as authoritative. He argued that

the Bible presented sufficient evidence of its truth to sinners, to enable them to believe it, and sufficient motives to induce them to obey it—that until they believed and obeyed the gospel, in vain they expected salvation, pardon and the Holy Spirit—that now is the accepted time, and now is the day of salvation.''

He then adds:

''These truths we had proclaimed and reiterated through the length and breadth of the land, from the press and from the pulpit, many years before A. Campbell and his associates came upon the stage as aids of the good cause. Their aid gave a new impetus to the Reformation which was in progress, especially among the Baptists in Kentucky; and the doctrine spread and greatly increased in the West. The only distinguishing doctrine between us and them was, that they preached baptism for the remission of sins to believing penitents. This doctrine had not generally obtained amongst us, though some few had received it, and practised accordingly. They insisted also upon weekly communion, which we had neglected. It was believed by many, and feared by us, that they were not sufficiently explicit on the influences of the Spirit. Many unguarded things were spoken and written by them on this subject, calculated to excite the suspicions and fears of the people, that no other influence was needed than that in the written word; therefore to pray to God for help was vain. The same thing had been objected to us long before, and with plausibility too; for we also have been unguarded in our expressions. In private conversation with these brethren our fears were removed, for our views were one.''

In speaking of the prejudices against him and his brethren in Kentucky for uniting with the Reformers (the followers of Alexander Campbell) he has the following to say:

''But what else could we do, the Bible being our directory! Should we command them to leave the foundation on which we stood—the Bible alone— when they had come upon the same? By what authority could we command? Or should we have left this foundation to them, and have built another? Or should we have remained, and fought with them

for the sole possession? They held the name 'Christian' as sacred as we did—they were equally averse from making opinions the test of fellowship—and equally solicitous for the salvation of souls. This union, irrespective of reproach, I view as the noblest act of my life.''

It will be observed that in speaking of the difference between his followers and the followers of Mr. Campbell, Barton W. Stone said:

"They insisted upon weekly communion, which we had neglected.''

He did not say that it was wrong to have weekly communion, but spoke of it as a matter that his followers had neglected. Also it must not be overlooked that he further said:

"In private conversation with these brethren our fears were removed, for our views were one.''

And that he also said in substance that the followers of Mr. Campbell had as much right to the use of the name "Christian" as his followers had, and that he viewed the union between the two "as the noblest act of my life.'' It further appears that for more than one hundred years the church, whether composed of followers of Barton W. Stone or the followers of Alexander Campbell, was known as the "Christian Church.''

Where a donor has dedicated property to advance or disseminate a particular religious doctrine or faith, and conflicting claims arise as to its ownership or possession, the civil courts will determine which of the rival claimants are holding to the faith the donor desired to favor, and award the property to them. Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684. In the light of the language of the great leader, Barton W. Stone, and other facts appearing in the record, it hardly can be said that there is any substantial difference between the religious views of his followers and the followers of Mr. Campbell. We therefore hold that the Church as now conducted is the "Christian Church" within the meaning of the deed.

But even if we were less certain as to the soundness of this conclusion, it would not follow that the judgment awarding the property to the Kentucky Christian Conference would be proper. For a great many years the Kentucky Christian Conference was an unincorporated society. By an act of the General Assembly approved

April 5, 1878, it was incorporated with certain powers. It always has been and is now a purely voluntary society composed of ministers and delegates from affiliated churches which send letters and reports indicating their condition and progress. No Christian Church or its minister is compelled to be a member of the Conference. It is not a supreme judicatory, with the power to make laws for the government of the churches, or to prescribe articles of faith, or to control church property. Indeed, the possession of these powers would be subversive of the very purpose for which the church was formed. Indeed, it cannot be disputed that the Christian Church has a congregational form of government and that each local church administers its own government by the voice of a majority of its members. That being true, it cannot be doubted that a majority of the members of a Christian Church has the power to call its own minister, to determine when and by whom protracted meetings may be held, to withdraw the church from a purely voluntary organization, such as a Conference, and also to provide for holding communion services weekly rather than at less frequent periods, without departing from the faith. Rose v. Briggs, 205 Ky. 619, 266 S. W. 236; Poynter v. Phelps, 129 Ky. 381, 111 S. W. 699, 24 L. R. A. (N. S.) 729; Thomas v. Lewis, 224 Ky. 307, 6 S. W. (2d) 255. But the point is made that by Section 2 of its Articles of Incorporation the Kentucky Christian Conference is given the power ''to receive and hold, by purchase, devise or gift, any and all such real and personal property as may be needful for the purposes of the said Conference, or for such churches as are now, or hereafter may be, organized under it, and may sell and dispose of the same when the interest of the Conference requires it.'' That is true, but the land in controversy was not purchased by, or devised or given to, the Conference. Nor was the church built or paid for by the Conference. On the contrary, it was built by private subscription. As the property was never conveyed to, or paid for by, the Conference, the mere fact that the church and its pastor withdrew from the Conference did not have the effect of vesting in the Conference either the title or control of the property. In the circumstances the Conference is no more entitled to the property than any other stranger, and the court erroneously adjudged it to be the owner.

In conclusion we may add that where the ''union of

330

all the followers of Christ" is the object for which a church was formed, and to which its founders and their followers have devoted their lives, the courts will not seize upon some slight difference of form or practice to work a disunion, and thus thwart the purpose of its founders.

Judgment reversed, and cause remanded, with directions to dismiss the petition.