## Kidwell et al. v. Crawford et al.

Oct. 17, 1944

Norman Bowman and B. S. Grannis for appellant.

Roy Wilhoit and Chas. Reidinger for appellees.

OPINION OF THE COURT BY JUDGE HARRIS—Reversing.

For the purpose of organizing a Christian Church on Indian Fork of Kinniconick Creek, in Lewis County, Z. T. Thacker and others associated with him entered into the following covenant:

"Covenant of Church Organization, entered into on the second Sunday in March, 1909.

"We, whose names are hereunto subscribed, desiring to organize and perpetuate a Christian Church, on the Indian Fork of Kinney in the County of Lewis and State of Kentucky, being assisted by Z. T. Thacker, Sr., do hereby agree to unite ourselves together in Church capacity of Love and Fellowship in Christian work, taking the Bible for our Rule of Faith, the Lord Jesus Christ, the head of the Church, and our Leader and Commander; Christian, the name by which his followers is distinguished, not from each other, but from the World; also accepting Christian character as our test of fellowship; individual interpretation of scripture; to labor for the union of all God's people."

In September following, pursuant to and for the purpose indicated in the covenant, a number of citizens of the community, including the appellees, conveyed to the appellees and to one H. E. Smith, as trustees of Thacker Chapel, one-quarter of an acre of ground on which the organizers and the other members erected a house of worship. The deed does not contain any reversionary provision or undertake to impose any conditions or limitations or to restrict the use, management or control of the property therein conveyed other than as implied by the fact that the property was being conveyed to the grantees and their successors as Trustees of Thacker Chapel Church. In 1941, the appellee trustees and some of the other members, apparently a minority of those actively participating in the Church's activities, became dissatisfied with the literature which was being used in the Sunday School. In their anxiety they became persuaded that the superintendent, assisted perhaps by a few others, was undertaking to infiltrate the Sunday School and the church membership with the doctrines

of the Church of God, which doctrines, they allege, are inconsistent with and antagonistic to those of the Christian Church. During the agitation which ensued, an effort was made to elect three trustees; and finally the whole controversy was referred by some of the membership to a committee of the Christian Conference. This committee made the following report:

"We, the committee of Kentucky Christian Conference has aggreed to retain the old officers of church as they were let the new ones grow up with them and take their place as one passes away, and work to gether in in Christ let Bro. love continue, do away with Church of God leture and there pasture, choise the leture and Supt. of our own church. Signed H. P. Jones, Delmore Cooper."

Some of the members seem to have been willing to accept and to abide by this recommendation of the committee, while others of the membership were not so disposed. The net result of all these criminations and recriminations was the institution by the appellees of the present litigation. The pertinent allegations of their petition, which closes with a prayer for injunctive relief, are in substance these:

That for the purpose of inflaming the membership of the Church and to proselyte them to a different faith of religion and church procedure and thereby secure control and management of Thacker's Chapel Christian Church, the defendant, A. B. Kidwell and his co-defendants were promoting the sale, distribution and use of pamphlets, circulars, books and other literature that were antagonistic to the teachings and doctrines of the Christian Church and had wrongfully taken charge of the Sunday School procedure and unless restrained from so doing, they would through the acts complained of confiscate, take over and control said property to the great and irreparable injury of the plaintiffs and the other members of the Church organization.

Substantially, the testimony on behalf of the appellees is as follows:

The witness Fryman:

"Q. What I am trying to ask you is if any pastor or preacher who has professed to preach at Thacker's

Chapel Christian Church, ever in your experience upheld the Church of God organization? A. I don't know whether you would call it that or not. During our revival at Indian Creek, I don't know whether to be certain, but from rumors, I thought that the pastor, Brother Charles, had leaned to the Church of God. From my observation, I thought he had leaned to that side.

"Q. Do you mean C. W. Roberts? A. Yes, sir.

"Q. Do you know A. B. Kidwell? A. Yes sir.

"Q. Do you know whether or not he is a member of the Christian Church? A. He is not. He is a Church of God man."

Plaintiff Crawford:

"Q. This quation of literature, didn't it concern only the Sunday School? A. The church members is in the Sunday School.

"Q. But wasn't this only in Sunday School that they had this different literature? A. Well, you can decide that yourself. They generally had prayer service, and after that they went on in the Sunday School all in the same service.

"Q. Was there any church of God literature used in Church worship? A. No, as far as I know they never used any literature in the worship.

"Q. They just used this literature in the Sunday School? A. Yes sir.

"Q. Do you know how this literature differs from literature of any other kind used by Christian churches? A. Well, I never studied the difference in the literature of this Gospel Trumpet and others anymore than I see in the home. I don't know as there is much difference. The most difference is in these pamphlets they send around.

"Q. Does it teach a different faith from the Christian Church? A. Yes, sir.

"Q. How does it differ? A. They don't believe in any denomination. They argue that the denominations are not in the teachings of the Bible.

"Q. Is that in their Sunday School literature? A. I don't know.

384

"Q. What different faith is proclaimed in their Sunday School literature, or do you know? A. I don't know. Of course, the comment on the lessons, and their comments are different.

"Q. As a matter of fact, aren't all these Sunday School lessons prepared by the International Sunday School Lesson for the Christian Chuch? A. I think so."

Plaintiff Stamm:

"Q. You say the dispute is over these Saint people trying to take the church away from you? A. I think so.

"Q. Who are they? A. Rev. Roberts, and I think the whole bunch is into it.

"Q. Do you mean the Defendants in this case? A. Yes, sir.

"Q. You think. Do you know whether or not they subscribed to any Saint faith? A. They took Saint literature and had Sunday School. They wouldn't take the other literature.

"Q. What other literature? A. Any other kind.

"Q. How does this literature that they have differ from any other that you know about? A. The Saint people and the Christian people is altogether different when it comes to a great many things.

"Q. Is there a difference in their Sunday School literature? A. I don't know.

"Q. Did you ever see any literature they had? A. Yes, I have seen it.

"Q. Did you compare it with other literature? A. I don't know.

"Q. Did you ever attend that church at either church or Sunday School when anyone preached a faith different from the Christian Church faith that you have subscribed to? A. They don't preach alike at all.

"Q. Name who you heard? A. I don't know as I have heard anyone who preached up there.

"Q. You mean you heard it at different churches. Did you ever hear it at Thacker's Chapel Christian Church? A. I don't know as I ever did.

"Q. And you have never heard any different doctrine preached? A. I haven't been there for a long time.

"Q. You got mad and quit going? A. I don't believe in going to a place where they. don't treat me right.

"Q. You don't know whether they are teaching a different faith? A. I know they are teaching a different faith, but I don't know what it is."

Bruce Stamm:

"Q. Bruce, you saw their literature? A. Yes, I saw it.

"Q. Did you examine it, read it? A. I was in Sunday School and read a lesson in it.

"Q. Did you see where it was different from any other literature. A. Not that I know of.

"Q. Could you tell whether or not it preached. or advocated a faith different from your Christian Church faith? A. No, I don't know.

"Q. You say, Bruce, you were in the Sunday School Class when this literature was being taught? A. Yes, sir.

"Q. Was Kidwell there? A. Yes, sir.

"Q. Did he have anything to say about it or any comments to make about his belief? A. I heard him say in that Sunday School that he didn't belong to that church and never expected to. He did some talking but I never paid any attention to it. He says one is born into the church and can't join it."

James Thompson:

"Q. Were you at Sunday School at any time when they were teaching from this literature? A. I was there once.

"Q. During the teaching, did you hear any comments different from the old faith? A. The only comments made, Mr. Kidwell was reading some of it. He stopped and said he didn't belong to this church and never expected to."

Some thirteen witnesses were introduced on behalf of the appellants. The substance of their testimony was that the preacher and the Sunday School superintendent did not preach or advocate any doctrine other than that of the Christian Church, and that there was nothing in the Sunday School literature that so offended. Both the pastor and the superintendent disavowed any desire or

intention to depart from the rules, doctrines or teachings of that church. In addition, the superintendent explained specifically how he came to be using the Sunday School literature of the Gospel Trumpet Publishing Company:

"Q. What was your purpose for advocating the literature of the church of God? A. When the Sunday School was organized, I asked the folks when the officers had been placed to get some literature if any body knew any company. Someone said that the Kentucky Christian Conference had no publishing house and I said it was essential to have the literature but no one recommended anything and I passed out in the yard and the secretary came and said what are we going to do about literature and she said, 'Don't you know of any company?' I said I had a letter from the Gospel Trumpet Company and they are making an offer to furnish first quarter literature free of charge to anyone who organized a Sunday School. She said why not order there. I said that was up to her. She said let me have their address and I will order it."

It does appear in the record, however, that the congregation elected to discontinue the use of the Sunday School literature which was being used and to replace it with proper literature from some other source. On this account the superintendent was wrong in continuing the use of the literature of the Gospel Trumpet Company; not necessarily that it was inimical to the doctrines and teachings of the Christian Church, but because the congregation by a proper vote had interdicted it. And it further appears that an attempt was made to oust the appellees as trustees. But in view of the fact that they had served continuously in that capacity since the formation of the church, with no attempt by the membership during that time to replace them; and since no notice of the contemplated action had been given and only a minority of the membership was present, the court is of the view that the effort which was made in this respect was not effective.

Upon final submission the Chancellor entered the judgment from which this appeal has been prosecuted. In part, the judgment reads:

"(2) That the plaintiffs herein, Roland T. Crawford and P. L. Stamm, are the legal trustees of the church

property named and set out in plaintiffs' petition, and known as 'Thacker's Christian Church.'

"(3) That the use of said church property by defendants, or those acting with, for, or through them, must be by the consent of said legal trustees.

"(4) That the use of the Church of God literature published by the Gospel Trumpet Company in the Sunday School conducted at said church shall be abandoned.

"(5) That the Pastor of said church shall select the literature used in said Sunday School, but it shall be other than the Church of God literature.

"(6) That the Pastor of said church shall select a Sunday School Superintendent if one is desired by the church, but he must be a member of the Christian Church.

"(7) That the defendant, A. B. Kidwell, be, and he hereby is enjoined from conducting the Sunday School at said church.

"(8) That the injunctive relief as prayed for in plaintiffs' petition be, and same hereby is granted to the extent indicated above and further as follows: * * *''

The appellees seem to be under a misapprehension both as to the right and authority of the trustees under the deed and as to the jurisdiction of the Civil Courts in dealing with controversies in churches having the congregational form of government. As indicated previously, the deed itself does not undertake, either in so many words or by implication, to invest the grantees per se with any jurisdiction, authority or control over the internal affairs of the church, or to confer upon them any power or jurisdiction to determine, in contravention of the will of the congregation, what officers shall be selected by the membership; nor is there anything in the covenant supra which delegates to the trustees any such right, power or authority.

As stated by this Court in Thomas v. Lewis, 224 Ky. 307, 6 S. W. 2d 255, there are three forms of Church government which have gained prevalence in Christian communities: (1) The prelatical form, in which the governing power resides in prelates or diocesan bishops and the higher clergy; (2) the presbyterian form, in which the govering power resides in assemblies, synods, presbyteries, and sessions; (3) the independent or con--

gregational form, such as the Baptists, Congregational-
ists, Christian, and other independent churches, in which
the body is self-governing, each single and local church
administering its own government by the voice of the
majority of its members. Controversies of a doctrinal
or theological nature and disciplinary measures affect-
ing individual membership, the selection of the congre-
gation's pastor and church officers, what literature shall
be used, the hours of meeting, what persons shall be ad-
mitted to membership, and all such kindred matters, lie
solely and exclusively within the jurisdiction of the prop-
erly constituted authority of the church itself, which,
in the case of the Christian Church, is the local congre-
gation; subject, however, to the exercise of jurisdiction
by courts of equity in cases involving a diversion of the
church property to another denomination or to a group
supporting doctrines radically and fundamentally op-
posed to those of the complaining congregation. Parker
et al. v. Harper et al. 295 Ky. 686, 687, 175 S. W. 2d 361;
Vaughn et al. v. Maynard et al., 294 Ky. 38, 170 S. W. 2d
897; Martin v. Kentucky Christian Conference, 255 Ky.
322, 73 S. W. 2d 849; Thomas v. Lewis, supra.

It at once becomes evident, therefore, that the ap-
pellees' evidence falls short of that nature and quality
which would entitle them to some of the relief which the
Chancellor adjudged. The judgment transcends the
jurisdiction of the civil courts and represents the ex-
ercise by the court of prerogatives which are peculiarly
those of the church itself. Consent of the appellee
trustees to the use of the church property by the ap-
pellants and other members of the church is not re-
quired, but is a matter resting within the discretion and
will of the membership. Neither does the court have
jurisdiction to deprive the membership of exclusive
authority to determine what literature shall be used in
the Sunday School, or to determine whether the appel-
lant Kidwell or some other person shall or shall not be
the superintendent of the Sunday School, or whether
the person selected shall or shall not be a member of
the Christian Church, so long as the literature used and
the activities, teachings and conduct of the superintend-
ent and of the members are not subversive of the true
doctrines, faith and teachings of the Christian Church.

Judgment reversed and cause remanded with in-
structions to enter a judgment, adjudging the appellees

to be the trustees of Thacker Chapel Christian Church and entitled to their costs in this action, and restraining and enjoining the appellants from using in the Church or Sunday School any of the literature of the Church of God or of the Gospel Trumpet Publishing Company until otherwise determined by the congregation.